UNITED STATES, Appellee

v.

Michael J. BINS, Sergeant First
Class, U.S. Army, Appellant.

No. 94–1211.
CMR No. 9200243.

U.S. Court of Appeals for
the Armed Forces.

Argued May 17, 1995.

Decided Sept. 27, 1995.

For Appellant: *Captain Blair M. Jacobs* (argued); *Colonel Stephen D. Smith* and *Major Roy H. Hewitt* (on brief); *Lieutenant Colonel John T. Rucker.*

For Appellee: *Captain Kenneth G. Wilson* (argued); *Colonel John M. Smith, Major Lyle D. Jentzer, Captain Michael E. Mulli-* *gan* (on brief); *Lieutenant Colonel James L. Pohl.*

## Opinion of the Court

GIERKE, Judge:

1. Sergeant First Class (SFC) Michael J. Bins appeals his convictions of attempted rape, attempted forcible anal sodomy, failure to obey a lawful order, forcible oral sodomy, assault with a means likely to produce grievous bodily harm, and communicating a threat, in violation of Articles 80, 92, 125, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 880, 892, 925, 928, and 934, respectively. Despite his pleas, SFC Bins was convicted by a general court-martial composed of officer and enlisted members. The approved sentence was a bad-conduct discharge, confinement for 5 years, total forfeitures, and reduction to Private E1.

2. The Court of Military Review* ordered a new post-trial recommendation and action based on several omissions in the staff judge advocate's recommendation including "fail[ure] to respond to the post-trial assertions of legal error" and omission of a complete list of the charges and the findings thereon. 38 MJ 704, 707 (1993). Following the new action, the court below on further review affirmed the findings and sentence in an unpublished opinion. We granted appellant's petition to decide the following issue:

> WHETHER THE MILITARY JUDGE ERRED BY REFUSING TO ORDER THE PRODUCTION OF RELEVANT TESTIMONY THAT DEMONSTRATED A MOTIVE ON THE PART OF MS. [P.], THE ALLEGED VICTIM, TO MAKE FALSE ACCUSATIONS AGAINST SERGEANT FIRST CLASS BINS.

We hold that the military judge did not commit reversible error.

## I. Background

### A. Facts

3. SFC Bins was assigned to an artillery unit in Hanau, Germany. On July 13, 1991, he deployed to Crete, Greece, for an exercise at the NATO Alliance Missile Firing Installa-

---

*See 41 MJ 213, 229 n. * (1994).

tion (NAMFI). SFC Bins was familiar with the local area because he had been assigned to NAMFI previously. During the night in question, his unit was required to return to the "Cantonment area" by 2300 hours as well as comply with the NAMFI Headquarters 0100 hours curfew.

4. Theresa P., a 25 year-old U.S. citizen traveling abroad, was living in the nearby town of Hania, Greece. She had been traveling and working in Europe since May 1990 and arrived in Hania during mid-May 1991. She obtained a job teaching English as a foreign language, but it would not start for several weeks. After some additional traveling in Greece, she returned to Hania and started teaching in early July 1991. Around 2215 hours on July 14, Theresa left her room in a pension house and went to a local bar to escape the summer heat.

5. About 2 hours later, around midnight, SFC Bins entered the bar and sat next to Theresa. The two talked together for about 30 minutes. SFC Bins asked Theresa if she wanted to join him in going to another local bar; she agreed, and the two walked a short distance to the bar. At about 0130 hours, they left the bar, again at SFC Bins' invitation, to find a restaurant and eat. They were unable to find an open restaurant, so SFC Bins suggested they travel by taxi to another area where at least two restaurants would be open. Theresa said, "Well, okay," and the two found a taxi and started the trip.

6. They rode in the taxi for about 10 to 15 minutes until SFC Bins told the driver to stop. Theresa asked SFC Bins why the taxi didn't continue on to a mass of lights about 200 meters away, and he said, "Well, the walk is nice." After SFC Bins paid the fare, the two exited the taxi and started walking on the road toward the mass of lights. After walking a short distance, Theresa felt a heave from her left side, and she fell down, causing her to lose consciousness. After regaining consciousness, Theresa remembered crawling on the road trying to make it to the mass of lights when SFC Bins kicked her in the face. The kick's force knocked out Theresa again. SFC Bins grabbed Theresa by her ankles and dragged her from the road over some rocks toward the sea.

7. When she regained consciousness, Theresa saw that SFC Bins was naked, and he demanded that she take her shorts off. Theresa refused initially, but SFC Bins picked up a rock and threatened her with death. After his attempt at vaginal intercourse failed, SFC Bins demanded that Theresa perform fellatio. Again, Theresa initially refused until SFC Bins struck her in the face with the heel of his hand and threatened to kill her. He attempted intercourse and told Theresa to assist him in penetration. She guided his penis toward her anus instead, to avoid an unwanted pregnancy. SFC Bins was unable to achieve an erection, and his second attempt at intercourse also failed.

8. SFC Bins told Theresa to continue moving down the rocky slope toward the sea, and she complied. Once there, he told Theresa to get on the ground and assume a position for anal intercourse. She complied, and he attempted to penetrate her anally but failed because he was unable to achieve an erection. SFC Bins demanded fellatio and told Theresa to make his penis erect. She complied, and soon SFC Bins again attempted anal intercourse, but he was unable to maintain an erection, and his efforts were futile.

9. SFC Bins then noticed that Theresa had been using some of his clothing as a cushion against the rocks for her arms. He put his pants on, accused Theresa of stealing his money, and said, "That was all my German marks, all my money is gone, all of it." While SFC Bins searched for his money, Theresa was able to put on her underwear and shorts. Theresa described his search as a "rampage," like "he had lost a treasure . . . ." Theresa slowly moved up the rocks toward the road while SFC Bins continued his search, but before she reached the road he approached her and demanded vaginal intercourse. She refused, but he then demanded she perform fellatio for 5 minutes. She agreed to 2 minutes if he would let her go. She did so for about 30 seconds, reminded SFC Bins about his lost money, and he

returned to his search while she made it up to the road.

10. SFC Bins returned to Theresa and accused her of trying to get away. He straddled her, grabbed her by the neck, and struck her head against the road. She begged him to stop, and he resumed his search. Theresa noticed a person approaching the area and called out for help. Theresa continued her escape, naked from the waist up, and made it to the mass of lights where she found a gate guarded by another man. The gate guard let Theresa inside the compound, and they went to an office where he called the Greek police, who arrived about 2 hours later, around 0630 hours. Before the police arrived, however, an employee of the facility asked Theresa what had happened. During this conversation, she described her attacker as a black American male.

11. After the police arrived, Theresa accompanied them to the area where she had been attacked. The police found German, United States, and Greek currency; a man's comb; a pair of dark sunglasses; SFC Bins' military identification (ID) card; and her torn and bloody T-shirt. All the items were found within a short distance of each other. The police showed SFC Bins' ID card to Theresa, and she confirmed that the man pictured on the ID card was her attacker.

12. Previously during the afternoon and evening, SFC Bins had been at a bar in Hania with two other soldiers, both of whom testified at trial. Staff Sergeant (SSG) Croom, appellant's roommate, testified that he had left the bar and returned to the Cantonment area around 2130 hours on July 14, 1991. After SSG Croom left, appellant and SFC Malone had a few more beers and then returned to the Cantonment area by taxi. Once inside the area, SFC Bins left to make a phone call, and SFC Malone went to a 2300 hours formation for his platoon.

13. Due to the summer heat, SFC Malone left his room at about 0030 hours and went to sleep in SFC Bins' room as it had a fan. SFC Malone testified that SFC Bins was not in his bed or in the room when he entered. SFC Malone testified that when he left the room that morning at 0600 hours, he had not seen SFC Bins, and it appeared that SFC Bins' bed had not been slept in.

14. SSG Croom woke up when SFC Malone entered the room and woke up again at about 0400 hours and noticed that SFC Malone was still in the room, but SFC Bins was not. Shortly after dressing for work that morning, SSG Croom saw SFC Bins and noticed a cut or scratch on his neck.

15. That morning, both SFC Malone and SSG Croom asked appellant where he had been during the night. SFC Bins did not answer either question.

16. The staff judge advocate (SJA) for the U.S. Air Force in Crete was notified of the assault and, acting as the United States country representative, initiated contact with the Greek authorities to obtain exclusive jurisdiction over the offenses. The SJA retained a Greek attorney to represent SFC Bins in the Greek legal proceedings. That attorney initiated negotiations with Theresa's Greek attorney in an effort to reach an out-of-court settlement. In the Greek legal system, if an accused and the victim can reach a settlement, usually monetary, the victim can withdraw the "civil" charges, and the State will usually follow suit with the "criminal" charges.

17. Theresa became dissatisfied with her attorney's efforts and negotiated her own settlement with SFC Bins' attorney for $2,100.00. Theresa signed a document as part of the settlement, and she testified it said, "At this time it would not be in my best interests to have—to carry on with the case. I ask that [sic] the charges to be withdrawn from Michael Bins." Ultimately, the State withdrew the charges.

18. When Theresa's Greek attorney found out about the settlement, he demanded a share; she refused, and a physical confrontation between the two occurred. Theresa told the SJA about the confrontation, and the SJA decided to move Theresa into base housing, provide her with a meal card, a per diem allowance of $24.00 per day, and mental health counseling, despite the fact that Theresa had no military connection entitling her to these benefits. She received the per

diem allowance for about 45 days and lived in base housing for about 52 days.

19. At trial, Theresa positively identified SFC Bins as the perpetrator. In response to a question whether she was certain that SFC Bins was the perpetrator, she testified that "yes, a hundred percent, a thousand, a million, he's the one."

### B. Proceedings Below

20. SFC Bins filed a witness request asking the Government to produce his Greek attorney to testify at trial about the negotiations that led to the cash settlement in the Greek legal system. The prosecution opposed the request, and the matter was set for the military judge to decide. The prosecution also filed two motions *in limine*. The first requested that the military judge prohibit trial defense counsel from asking any witness questions suggesting that Theresa attempted to obtain or obtained payment or a civil settlement from SFC Bins. The second requested that the military judge prohibit trial defense counsel from making any reference or soliciting evidence concerning the per diem payments Theresa received from the Government and the negotiated settlement from SFC Bins.

21. At the pretrial hearing, the military judge heard several defense offers of proof and testimony from the SJA, Theresa, and SFC Bins. The defense proffered that SFC Bins' Greek attorney would testify about the negotiations that led to a cash settlement "in the Greek legal system." The defense also proffered that as a result of Theresa's claims against SFC Bins, the United States Government provided her with "substantial financial support, including money, lodging, meals, travel, and employment opportunities." Final Brief at 7. The defense argued that this information tended to impeach Theresa's credibility by showing she used the attack as an opportunity to obtain money—from SFC Bins and the United States Government—by making and maintaining the allegations against SFC Bins. Final Brief at 6.

22. The military judge granted the Government's motions *in limine*. In doing so, he found as follows:

Now, during the testimony that we have had, I find that the evidence does not establish such a motive to fabricate on the part of the victim in this case. I think her testimony is very clear that what she wants and her whole purpose was to see that the case was prosecuted, not to make any money out of it and that has come up several different ways. It is this judge's opinion that that is the motivation, not money.

Based on those rulings, the military judge denied the defense request for SFC Bins' Greek attorney as "irrelevant." The military judge added that if the evidence was relevant, it would still be excluded under Mil. R.Evid. 403, Manual for Courts–Martial, United States, 1984, "due to the danger of unfair prejudice, confusion of the issues or misleading the members or by creating a delay, wasted time and needless presentation of cumulative evidence." Subsequently, trial defense counsel asked the military judge to reconsider his rulings on the motions *in limine* in light of SFC Bins' constitutional right to present a defense. The military judge reconsidered and adhered to his previous rulings.

### II. Standards of Review

23. A military judge's decision to admit or exclude evidence of bias, prejudice, or motive to misrepresent is reviewed under the abuse-of-discretion standard. *United States v. Gray*, 40 MJ 77, 80 (CMA 1994). If the decision to admit or exclude evidence requires factfinding, the findings are reviewed under a clearly erroneous standard. *United States v. Quigley*, 40 MJ 64, 66 (CMA 1994) ("findings of fact will be set aside only if clearly erroneous," citing *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987)). A military judge abuses his discretion if the findings of fact are clearly erroneous or if the decision is influenced by an incorrect view of the law. *United States v. Sullivan*, 42 MJ 360 ¶ 13 (1995); *see* S. Childress & M. Davis, 2 *Federal Standards of Review* § 11.10 at 11–41 (2d ed. 1992) (citations omitted). A "military judge has wide discretion" when

balancing between probity and prejudice under Mil.R.Evid. 403. *United States v. Rust,* 41 MJ 472, 478 (1995).

## III. Analysis

### A. Evidence of Bias, Prejudice, or Motive to Misrepresent

24. At trial, the defense conceded that something happened to Theresa, but maintained that appellant did not do it. On appeal, SFC Bins argues that evidence of Theresa's financial interest was admissible under Mil.R.Evid. 608(c) because it had a tendency to show that she was biased and had a motive to make and maintain the misrepresentations against him. He further argues that the military judge's ruling, which "kept highly probative impeachment evidence from the members," denied him his right to confront and cross-examine Theresa. Final Brief at 3. The Government argues that the proffered evidence was "so tenuous" that it was "collateral to any important issue at trial" and, thus, excluding it was "appropriate." Answer to Final Brief at 7.

25. A witness may be impeached by evidence of "bias, prejudice, or any motive to misrepresent." Mil.R.Evid. 608(c). When the defense offers this evidence, it may deny confrontation rights to exclude it. *See, e.g., Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (Sixth Amendment Confrontation Clause requires defendant have a chance to show a prosecution witness' bias). Mil.R.Evid. 608(c) allows bias or prejudice evidence to be introduced through examination of witnesses "or by evidence otherwise adduced." Thus, extrinsic evidence is allowed under Mil.R.Evid. 608(c) but not under 608(b). *See, e.g., United States v. Banker,* 15 MJ 207 (CMA 1983) (specific acts of conduct that cannot be used to attack credibility may be used to show a witness' bias, prejudice, or motive to misrepresent).

26. An accused has the right to present evidence that is both "logically and legally relevant." *See United States v. Woolheater,* 40 MJ 170, 172–73 (CMA 1994). In *Woolheater,* we reversed an arson conviction because the military judge prevented the defense from presenting "legally and logically relevant evidence that someone else had the motive, knowledge, and opportunity to commit the arson." *Id.* at 173. In doing so, however, we noted that "the Constitutional right to present defense evidence ... is not absolute and may yield to policy considerations such as the interest in the orderly conduct at trials." *Id., citing Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). *See also* Mil.R.Evid. 403.

27. In *United States v. Gray,* 40 MJ 77 (CMA 1994), we reversed convictions for sodomy and adultery with the wife of a subordinate, and committing indecent acts with the subordinate's 9–year–old daughter. There we held that the military judge abused his discretion by excluding evidence that the subordinate and his wife accused appellant to shift attention from their own dysfunctional and abusive family situation. The excluded "evidence was relevant to show bias" and was admissible under Mil.R.Evid. 608(c). 40 MJ at 80. Excluding the evidence violated "appellant's rights to cross-examine the witnesses against him and to present [a] defense." We reversed because "[t]he trial was a credibility contest between appellant and his alleged victims. We cannot discount the reasonable likelihood that the excluded evidence may have tipped the credibility balance in appellant's favor." *Id.* at 81.

28. The Supreme Court reversed a rape conviction on a similar issue in *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988). There the defense theory was that the victim had lied about her contact with the defendant to protect her illicit relationship with another man. But the trial court granted the prosecutor's motion *in limine* and refused to let counsel impeach the victim with evidence of that relationship. *Id.* at 230, 109 S.Ct. at 482. Citing the Constitutional right of confrontation and the right to present motive and bias evidence, the Supreme Court held the trial court committed reversible error because: (1) the woman's testimony was essential and "crucial to the prosecution's case"; (2) the woman's story "was corroborated only by the largely derivative testimony of" the other man,

"whose impartiality would also have been somewhat impugned by" the excluded evidence; and (3) the State's case "was far from overwhelming." *Id.* at 233, 109 S.Ct. at 484.

29. We turn first to the evidence of payments in conjunction with Theresa's testifying as a witness. We agree with the military judge that those payments did not tend to prove bias or a motive to misrepresent because "at the completion of the testimony" a civilian witness, whether testifying for the Government or the defense, "will receive standard mileage and witness fees." D. Schlueter, *Military Criminal Justice: Practice and Procedure* § 11–2(D)(1) at 371 (3d ed. 1992). Indeed, tendering witness fees and travel expenses to civilians for testifying at a court-martial is a requirement for a valid subpoena. *See* Art. 47(a)(2), UCMJ, 10 USC § 847(a)(2). Likewise, civilian witnesses may be paid for travel and associated expenses to testify at a pretrial investigation under Article 32, UCMJ, 10 USC § 832. *See* RCM 405(g)(3), Manual, *supra.*

30. Turning next to the remaining evidence that Theresa received a cash settlement from SFC Bins to withdraw the "civil" charges in the Greek legal proceedings and the evidence that she received substantial financial support from the United States Government in a per diem allowance, housing, mental health counseling, etc., we hold that the military judge abused his discretion by excluding this evidence. It was relevant to show bias or a motive to misrepresent. Mil.R.Evid. 608(c); *cf.* Mil.R.Evid. 408 ("[t]his … rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness"). The military judge's finding was erroneous because he exceeded his authority and usurped the members' role by deciding that Theresa was not biased or motivated by money. The military judge erred by deciding whether Theresa was motivated by money, instead of deciding whether there was some evidence that tended to establish that she was motivated by money. Weight and credibility was for the members alone to decide. *See United States v. Tansley,* 986 F.2d 880, 885 (5th Cir.1993); *United States v.*

*Toomey,* 764 F.2d 678, 681 (9th Cir.1985), *cert. denied,* 474 U.S. 1069, 106 S.Ct. 828, 88 L.Ed.2d 799 (1986); *United States v. Bonadonna,* 775 F.2d 949, 958 (8th Cir.1985); *United States v. Arache,* 946 F.2d 129, 138 (1st Cir.1991), *cert. denied,* 503 U.S. 948, 112 S.Ct. 1507, 117 L.Ed.2d 645 (1992); *United States v. Pelullo,* 964 F.2d 193, 218 (3d Cir. 1992). *See also* S. Saltzburg, L. Schinasi, D. Schlueter, *Military Rules of Evidence Manual* 56 (3d ed. 1991) ("The judge must administer the legal concepts, and in doing so, may have to do factfinding. But the factfinding that relates to the questions of guilt and innocence and criminal responsibility is left to the members of the court … [T]he court-members have the final say on the weight to be given evidence.").

31. Relevant evidence is admissible. Mil. R.Evid. 402. Evidence is relevant if it has "*any tendency*" to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mil.R.Evid. 401 (emphasis added). This evidence meets that low standard and was admissible to prove bias or a motive to misrepresent. *See United States v. Hunter,* 21 MJ 240, 242(CMA) (" 'Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.' [Citation omitted.]"), *cert. denied,* 476 U.S. 1142, 106 S.Ct. 2250, 90 L.Ed.2d 696 (1986). Had the evidence been admitted, the defense would have been able to argue that SFC Bins was a target of opportunity and that Theresa's making and maintaining her claim against him was to supplement her unsteady employment as she traveled throughout Europe. While the military judge was not persuaded by the proffered evidence, "in a trial with court members, the weight or persuasiveness of the evidence would be unknown to him." *United States v. Jensen,* 25 MJ 284, 289 (CMA 1987) (Cox, J., concurring).

32. The military judge purported to perform the balancing test required under Mil.R.Evid. 403, but his ruling is without a meaningful explanation and simply recites the language of the rule. There was no other similar evidence presented at trial, and

thus the excluded evidence was not cumulative. The likelihood of misleading the members or confusing the issues was minimal. The court members—qualified under Article 25(d)(2) of the Code, 10 USC § 825(d)(2)—were capable of deciding whether Theresa was biased or motivated by money or was instead seeking justice in pursuing her claims against SFC Bins. While a military judge's concern for delaying proceedings with members is always warranted, these matters could have been covered on cross-examination in an efficient manner. Finally, with credibility or impeaching evidence, "the danger of unfair prejudice to the Government is greatly diminished." 25 MJ at 289. Considering these factors, we hold that the military judge abused his discretion by excluding the evidence under Mil.R.Evid. 403.

33. We hold that appellant's rights to cross-examine the witness against him and to present his defense were improperly limited. *See United States v. Lonedog,* 929 F.2d 568, 570 (10th Cir.) ("defendant's right to confrontation may be violated if the trial court precludes an entire relevant area of cross-examination"), *cert. denied,* 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 129 (1991). But prejudice is not presumed from these errors, so we will test for prejudice. *United States v. Williams,* 40 MJ 216, 218 (CMA 1994), *cert. denied,* — U.S. ——, 115 S.Ct. 737, 130 L.Ed.2d 639 (1995).

B. Harmless Error

■■■ 34. Before this Court will hold that a federal constitutional error did not prejudice an appellant, we "must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *See United States v. Bonavita,* 21 USCMA 407, 409, 45 CMR 181, 183 (1972); *United States v. Ward,* 1 MJ 176, 180 (CMA 1975); *United States v. Woolheater,* 40 MJ at 172. Our focus is not on whether the members were right in their findings but, rather, on whether the error had or reasonably may have had an effect upon the members' findings. *Cf. Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946) (harmless-error review of a nonconstitutional error requires an analysis of the effect of the error in the trial court). Here, the military judge's erroneous rulings limited defense counsel's ability to confront and cross-examine the key witness against SFC Bins; but in the context of the entire trial, we hold that the error was harmless beyond a reasonable doubt. We reach this conclusion for several reasons.

■■■ 35. Like the victim in *Olden,* Theresa's testimony was essential and crucial to the case. She was the alleged victim, the only eyewitness, and she identified SFC Bins as the attacker. But unlike the victim in *Olden,* her testimony was corroborated in several ways.

36. Her testimony that SFC Bins lost his money during the attack was corroborated by the German, United States, and Greek currency found at the crime scene. Besides the money, perhaps the most damaging piece of evidence—SFC Bins' military ID card—was recovered from the crime scene and admitted into evidence. The ID card's presence at the crime scene was compelling evidence of guilt.

37. Theresa's in-court identification of SFC Bins was unshaken and certain. She had ample time and opportunity to talk with and observe him before the assault. She was further corroborated by both SFC Malone and SSG Croom, who noticed SFC Bins missing from his assigned room during the relevant time period. And SSG Croom's observing the cut or scratch on SFC Bins' neck the morning following the attack was consistent with Theresa's identifying SFC Bins as the perpetrator.

38. Additionally, although the financial interest matters were off limits, defense counsel extensively cross-examined Theresa on several points including: prior inconsistent statements, her ability to remember, her alcohol consumption on that particular night, her possible bias against blacks, and the Government's extensive pretrial preparation of her. The cross-examination attacked her credibility and tried to show that her identification of SFC Bins was mistaken.

39. Finally, unlike the prosecution in *Olden,* the prosecution here presented a strong case against SFC Bins. So strong was the

prosecution's case that we can "discount the reasonable likelihood that the excluded evidence may have tipped the credibility balance in appellant's favor." *United States v. Gray,* 40 MJ at 81.

The decision of the United States Army Court of Military Review on further review is affirmed.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge (concurring in part and dissenting in part):

40. In my view, the fact that the alleged victim received witness fees and associated payments from the United States Government was a relevant matter for cross-examination. *See generally* 3A Wigmore, *Evidence* § 961 at 806 (Chadbourn rev. 1970). Accordingly, I would hold that the military judge erred in precluding the defense from cross-examining her on this basis.

41. Nevertheless, I agree with the majority opinion that the evidence of appellant's guilt was overwhelming. Therefore, error in not admitting these impeachment matters was harmless beyond a reasonable doubt.