EFFRON, Chief Judge,
with whom ERDMANN, Judge, joins (dissenting):
In a contested trial, a court-martial panel convicted Appellant of offenses against his minor cousin, EM, including assault consummated by a battery, carnal knowledge, communicating a threat, and kidnapping. The evidence against Appellant regarding the details of the charged offenses consisted primarily of the testimony of EM. The prosecution also offered corroborating evidence, including the testimony of persons who observed Appellant and EM in the aftermath of the incident forming the basis for most of the charged offenses. The prosecution sought to demonstrate that Appellant had attempted to deceive the witnesses to the subsequent events in order to shield himself from potential charges.
At trial, the defense vigorously challenged the prosecution’s case, contending that the allegations had been fabricated by EM. In support of that position, the defense sought to introduce evidence demonstrating EM’s motive to lie. In addition, the defense sought to introduce evidence in rebuttal of *118 the prosecution’s claim that Appellant had lied about EM’s medical situation in the aftermath of the incident. The military judge restricted Appellant in presenting both forms of evidence. The majority concludes that the military judge did not err in either respect. For the reasons set forth below, I respectfully dissent.
I. THE COMPETING THEORIES OF THE PARTIES AT TRIAL
A. OPENING STATEMENTS
The prosecution, in its opening statement, told the members that the evidence would show that Appellant drove EM “to his Officer-In-Charge’s [OIC’s] house on board Camp Pendleton. And in that house, he attempted to force her to perform oral sex on him. When she refused, he assaulted her repeatedly, confined her wrongfully in that house, and threatened her life.” Trial counsel also contended that Appellant had sexual intercourse with EM two years prior to the Camp Pendleton incident, while EM was fifteen years old. The prosecution stated that these charges would be supported “first and foremost” by EM and that her testimony would be supported by witnesses from near the Camp Pendleton home and law enforcement officers who responded to the event.
The defense, in its opening statement, contended that the case was “about lies made by an emotionally disturbed teenager, seeking attention.” Counsel described EM as having a lot of troubles in her life and noted that she had first begun receiving psychological treatment in 2002. As late as March 2007, six months before the accusations were made against Appellant, she had received psychological treatment because, “she wanted to kill herself, and she had been cutting herself.”
The defense asserted that on the day in question Appellant and EM had agreed to see a movie. Before going to the movie, Appellant wanted to check on his OIC’s home and take care of the dogs, since he was house-sitting for the warrant officer. While Appellant was taking care of the dogs, EM went to the bathroom. EM allegedly grabbed a knife owned by the OIC and threatened to kill herself. Appellant was surprised but wrestled the knife away from EM, who was having an “emotional breakdown” and repeatedly telling Appellant to get away from her. Appellant tried to settle her down and when he thought she was calmed down enough he tried to take her back to her mother. Rather than get into Appellant’s car, EM wandered down the street in “an emotional frenzy” collapsing in a nearby lawn.
B. TESTIMONY ABOUT THE CHARGED OFFENSES
1. Testimony by EM on direct examination
The prosecution called EM as its primary witness. At the time of the trial, in 2008, she was seventeen years old. EM testified she had known appellant for seven or eight years and that he had lived with her family in the past. EM stated that Appellant compelled her to have intercourse with him in 2005, but she did not tell anyone at the time of this event. EM then described a separate incident in September 2007, which began when she reluctantly agreed to go to a movie with Appellant after he threatened EM with harm to her family.
She testified that after Appellant picked her up in his ear, they did not go to the movie. Instead, Appellant told her that “he had to go to Camp Pendleton to feed his boss’s dogs.” After arriving at the house in Camp Pendleton, EM repeatedly requested that they leave and Appellant grew increasingly angry. At some point EM attempted to leave through the front door, when Appellant allegedly attacked her by grabbing her clothes and pulling her onto the couch. According to EM’s testimony, Appellant lowered his shorts and attempted to force her head towards his penis. EM got loose and headed for the front door again. Her testimony detailed a struggle with Appellant in which Appellant allegedly choked her, threatened her with a knife, and struck her. After striking her, Appellant allegedly asked her to get in his car and promised that he would take her to her mother and that she would never hear from him again. EM testified that she did not believe Appellant, but *119 agreed to go along with him. When they got outside to Appellant’s car she ran, eventually collapsing when a woman asked her if she needed help.
The prosecution also elicited testimony from EM that she was not on medication on the day in question, and she testified that she had not been on medication since 2003. EM stated that she believed Appellant told the witnesses that she was on medication in an attempt to make her appear “naturally unstable.”
2. Restrictions on the defense cross-examination of EM
During cross-examination, defense counsel attempted to ask EM questions about her past trauma, psychological condition and self-mutilation. Trial counsel objected. In the ensuing hearing before the military judge under Article 39(a), UCMJ, 10 U.S.C. § 839(a), defense counsel offered the following explanation for cross-examination of EM:
Sir, on direct examination, the government was asking questions about her state of mind. They’ve asked if she has been prescribed medication.... This goes to whether Corporal Sullivan’s belief that she was on medication was reasonable or not.
Counsel added that the cross-examination would “show the members why [the defense] theory of the case [was] reasonable.” The military judge rejected the defense position, stating that the prosecution had not “opened the door” to this line of questioning. The military judge added that he did not “see the relevance of talking about her psychological issues.”
The defense then sought to address the issue of self-mutilation, explaining the defense theory “that this young lady picked this knife up and she tried to injure herself.” Defense counsel contended, “That is how she got injured. And there is evidence that she — ” The military judge interrupted and stated that the defense had not presented that theory earlier in the trial, and that merely mentioning the theory did not mean that the defense was entitled to discuss the matter. The military judge asked defense counsel to articulate why self-mutilation in 2003 would be relevant to the circumstances of the charged events in 2007. Defense counsel noted that EM had stated during the pretrial hearing under Article 32, UCMJ, 10 U.S.C. § 832, that her last self-mutilation occurred in 2005, and there was evidence of self-mutilation in 2007. The defense stated that it wanted to confront the witness with statements made to her psychologist as a means of addressing credibility. The defense also wanted to contrast the evidence of self-mutilation with her testimony denying any suicidal tendencies.
In response to the military judge’s questions about the relevance of this evidence, defense counsel offered two reasons:
[One:] Our entire theory of the case is that this entire event occurred because she was having suicidal ideations. She picked up the knife and was going to cut herself, number one. So it goes to [Appellant’s] right to compulsory process.
Number two, it is relevant to show that at the Article 32 these matters were brought up, and she testified falsely about them.
In support of this view, defense counsel pointed to conflicts between EM’s testimony during the pretrial Article 32 hearing and other statements by EM, as reflected in a medical report from EM’s psychologist. The military judge ultimately concluded that the evidence was neither inconsistent nor relevant, and that in any case should be excluded under M.R.E. 403 as likely to confuse the members.
During the subsequent cross-examination of EM, defense counsel asked a number of questions about inconsistencies in EM’s testimony. The cross-examination indicated that EM had told one investigator that she had been raped by Appellant four times, while providing different numbers to other individuals. During cross-examination, the defense also was able to establish that EM had acknowledged, during the pretrial Article 32 investigation, that she had made a false statement to one of the law enforcement investigators.
*120 3. The prosecution’s evidence concerning developments in the aftermath of the charged offenses
a. The witnesses who observed Appellant and EM
To corroborate EM’s allegations, the prosecution offered the statements of a number of witnesses regarding events that occurred in the immediate aftermath of the incident forming the basis for the charged offenses. Ms. Eileen Taylor testified that she was walking her two young children near the home of Appellant’s supervisor when she observed a girl, EM, “walking down the street, sort of mumbling to herself.” Ms. Taylor stated that EM said that she was “looking for her mother” and that EM looked “out of sorts, like she needed some help.” EM collapsed onto a lawn when Ms. Taylor asked if she was okay. Ms. Taylor, a registered nurse, went to assist EM. She described EM as having a swollen lip, hyperventilating, being “terrified” and “a little bit disoriented.”
While Ms. Taylor was assessing EM, other neighbors began to arrive on the scene. One of these neighbors testified that EM’s emotional state was “Completely looped” and that she was “breathing heavy, eyes were rolling in her head, tears were going down her face. She was asking for her mom.” The neighbor also stated that EM had a “fat lip” and “a red mark on the right side of her neck.” All of the neighbors testified that after Appellant arrived at the scene, he endeavored to get EM into his car.
The witnesses also testified that Appellant made a statement about EM’s condition. Specifically, they testified that Appellant told them that EM had missed her medication. EM told at least one of the witnesses that she was not on medication.
The witnesses testified that EM refused to go with Appellant. They further testified that EM told them that Appellant would hurt her.
One of the witnesses, Lt. Col. Maney, took informal control of the situation. He testified that when he arrived on the scene, EM was “pretty much incoherent.” He also observed Appellant standing nearby on his cell phone with his car parked in the middle of the road. Lt. Col. Maney described Appellant as, “trying to — like anybody would if they were on [sic] a situation in base housing, trying to get her in the car, and let’s just move on, let’s move on from the scene.”
After EM refused to get in the ear with Appellant, Lt. Col. Maney suggested that Appellant call EM’s mother. ■ Appellant dialed the number and handed the phone to Lt. Col. Maney. When EM’s mother told Lt. Col. Maney that EM was not on any medication, he decided that the situation was “out of [his] hands” and called the Provost Marshal’s Office. Lt. Col. Maney testified that Appellant was cooperative and polite throughout the scene at base housing. He also testified that EM’s mother became very emotional when he asked about EM’s medication.
b. The testimony of EM’s mother
On direct examination of EM’s mother, the prosecution asked if EM had said anything about medications during the phone conversation between EM and her mother while EM was on the lawn in base housing. When defense counsel objected, the prosecution indicated that the testimony would demonstrate that Appellant had sought to transform his crime into a benign incident by fabricating an explanation. According to the prosecution, the testimony from EM’s mother would show that Appellant had lied to the other witnesses and that he “was trying to extract [EM] from the situation by saying that she was on medications when she was not.” The military judge did not rule on the defense objection, but EM’s mother was permitted to testify that EM was not on medication on the day in question.
When the defense attempted to pursue the relationship between the testimony of EM’s mother and the credibility of Appellant’s statements in the aftermath of the incident, the prosecution objected. The prosecution asserted that questions concerning EM’s pri- or use of medications did not involve evidence relevant to the case. In response, defense counsel noted that the prosecution had interjected into the case the link be *121 tween EM’s prior use of medication and the assertion that Appellant had fabricated an explanation for the incident. The defense expressed concern that the prosecution, in its closing statement, would rely on the asserted false statement by Appellant.
The military judge noted the defense point, stating:
I guess the point here is: That standing alone. It could look like he’s making this up out of the clear blue as some story to tell these people that are all around her. If he had it in his head — if he knew she had been on medication, whatever, six months ago or something, then this might go to show that he had some knowledge that she had been on medication. This wasn’t fabricated.
In response to the military judge’s question as to the details that the defense would try to elicit, defense counsel responded:
The government wants to have their cake and they want to eat it too. They want to introduce [Appellant’s] statement that she’s on medication. Then they want to prevent me from arguing that, and then argue to the jury that my client is a liar and he was trying to completely fabricate the story.
They opened the door. I didn’t ask that witness that question on direct. He opened the door. I want to ask well, when was your daughter prescribed medication then, if she ever was?
The military judge indicated that he would allow the defense to ask a single question as to whether EM had ever been on medication. Upon further objection from the prosecution, the military judge limited the time frame of the question to medication use within a year of the September, 2007, event. Ultimately the military judge sustained the objection to the defense counsel’s general question: “Was [EM] ever prescribed medication in the past?” The military judge concluded that such questions would confuse the members: “The girl is 17 years old and everyone’s been on medication. I’m just not going to allow it at this point.” The military judge left open the issue for the defense case-in-ehief but no further questions were asked concerning EM’s medication use or psychological history during cross-examination.
4. The testimony proffered by the defense concerning EM
During its case-in-ehief, the defense sought to present testimony from Dr. Herbert McMiehael who provided psychological services to EM. The defense contended that testimony would provide evidence concerning the source of EM’s injury as well as her motive to fabricate.
In a session before the military judge under Article 39(a), the parties discussed the relevance of the proposed testimony. Defense counsel stated that the testimony would provide information concerning EM’s history of suicidal ideation and self-mutilation. In addition, the defense stated that the evidence would show that EM’s condition had been a source of conflict between EM and her mother, and that consideration had been given to placing EM in a facility for residential treatment. Counsel argued that the evidence would show that EM had a variety of motives to fabricate the allegations against Appellant, including a desire to gain sympathetic attention from her mother, and a fear of her mother’s reaction if she knew that EM had engaged in further attempts at self-mutilation.
During the Article 39(a) session, Dr. McMiehael stated that he had met with EM an average of seven times per year from 2002-2007. He stated that EM had a long history of suicidal ideation going back to at least 2002 when EM first started receiving treatment. He described suicidal ideation as part of the continuum of suicidal thought and behavior, with suicidal ideation at one end of the continuum, while forming a suicidal intent or plan would be further along the spectrum. According to Dr. McMichael’s testimony, EM’s last reported suicidal ideation occurred in March, 2007.
Dr. McMiehael also discussed EM’s history of self-mutilation. Dr. McMiehael distinguished self-mutilation from a suicide attempt, and described it as a dysfunctional coping skill. “The agony that a person is experiencing, they’re depressed, they’re anx *122 ious, they feel in their chest, they think it and process it in their head.” The physical cutting “reduces the psychological pain that the person is having.” Dr. McMichael told the military judge that although the primary focus of self-mutilation involves a form of control, it also can have a secondary effect in terms of gaining attention. His testimony described two major periods of self-mutilation by EM, occurring in 2005 and early 2007, and he indicated that there had been earlier self-mutilation.
Dr. McMichael said that he had discussed the possibility of hospitalization with EM’s mother during the 2005 period of self-mutilation. He said that EM’s mother was “open to the idea, but she really wasn’t keen on the idea.” In his report, Dr. McMichael noted, “Mom realizing the need to consider alternative interventions for client including residential placement.” At that time, Dr. McMi-ehael also discussed a “no suicide contract” with EM, which is an approach used when the doctor feels concerned that someone is “moving into the direction of high risk.” This is essentially a stated commitment by the patient to contact the doctor if personal thoughts turn to committing suicide; the commitment to the agreement itself is part of suicide prevention. In March, 2007, the medical records indicated that EM was at moderate suicide risk.
In describing EM’s family dynamic, Dr. McMichael testified, “Well, there was a theme that’s emerged on and off throughout [EMJ’s life. Not feeling special enough to her mom, and when her mom gives someone else attention, it is upsetting for [EM].” He further noted that EM had a “love/hate” relationship with her siblings and her mother. “Always competing for position in the family. Always competing for attention and affection. Always overly sensitive to being rejected by anybody in the family.” Elsewhere he offered the following description of EM: “This is a child who early in life was violated by numerous people and she never internalized a feeling of security and safety that a family can provide.” He continued, “She is always looking over her shoulder expecting something scary or bad to happen.” Dr. McMichael noted the complexity of the family dynamic by stating that “they’re always putting each other down and at the same time they’re wonderfully supportive of one another.” He also testified that EM’s mother had started to take care of two more of EM’s cousins, noting that while EM appeared to enjoy interacting with her cousins, it signaled reduced attention from her mom.
In describing EM’s underlying psychological condition, Dr. McMichael noted EM’s recent improvements in the months prior to the charged offenses. He added, however, EM’s mental condition was like a “volcano” and pressure could build up at any time. He stated that EM’s condition “cycles from mild to acute and from active to delayed.” He explained that a trauma has a lasting psychological impact, “[s]o that the trauma that took place ... [fifty] years ago is no less significant than the trauma that took place one year ago.” Dr. McMichael also testified that in treating EM, he looked for “[t]riggers of depression.” He further noted that during the summer of 2007 EM appeared the healthiest of her time in treatment. In response to a question from the military judge concerning the events of September 2007, Dr. McMichael testified that, “[t]here were no triggers prior to that event that would lead [him] to believe that [EM] would be wanting to hurt herself.” He subsequently noted that individuals with EM’s problems would be prone to depression on holidays, birthdays, and anniversaries of deaths. He testified that times of celebration would remind EM of family members who were not there anymore but also expressed particular concern for anniversaries of deaths, such as the October 2003 death of EM’s sister. He noted that any of these events could serve as triggers. The defense had previously elicited testimony that EM’s birthday occurred the day prior to the alleged events in the Camp Pendleton home.
During the Article 39(a) session, Dr. McMichael also described EM’s history regarding usage of medication. The record is not clear on the time lines for specific medications, but the doctor testified that he prescribed two different psychiatric medications *123 at different periods of time. He noted that her last prescription occurred in 2005. Dr. McMichael testified that EM had never been compliant: “She would take them for a little while and then she wouldn’t take them.”
After the proffered testimony, defense counsel explained that they wanted to introduce this testimony as evidence of self-mutilation, suicidal ideation, and EM’s family dynamic. Defense counsel presented two theories of relevance for this particular testimony.
Under the first theory of relevance, the defense sought to demonstrate that EM may have been the source of the injuries that occurred inside the house at the time of the charged offenses. The military judge asked if there was any other evidence in the ease, outside of the proffered testimony, that EM was the source of the injury. Defense counsel stated that there was no other evidence that EM had inflicted the injuries on herself, but noted that the source of the injuries was an issue in dispute in the case.
Under the second theory of relevance, the defense cited the issue of whether EM had a motive to fabricate. The defense, in its written submission, referred to the issue of whether EM had a motive to fabricate the allegations in order to avoid possible hospitalization resulting from her actions in the house. During the Article 39(a) hearing, defense counsel also argued that EM had a motive of gaining attention. Specifically, counsel noted that EM had four brothers and sisters and that she competed with them for her mother’s attention. Dr. McMichael had described this as a recurring theme in her treatment, and defense counsel argued, “[wjhat better way to get attention from your mother than to say my cousin raped me and assaulted me.” Defense counsel also argued that the proffered testimony should be viewed in the context of other evidence impeaching EM’s credibility, including a defense witness who testified that EM had admitted to lying about events. Counsel noted that in view of this evidence of falsehood, the defense needed “to present to the members why she’s being untruthful.” Defense counsel noted:
[Ojur theory of the case is that she is attention starved. She wants the attention from her mother. She loves the attention from Dr. McMichael. And interestingly enough, Dr. McMichael said, [w]ell you know what, the self-mutilation, secondarily could be to get attention from her mother. That is our theory of the case. And it is not unreasonable.
The defense contended that exclusion of this evidence would violate the right to confrontation and compulsory process.
The military judge ruled against the defense, prohibiting the introduction of any evidence of EM’s mental health issues. The restrictions imposed by the military judge precluded testimony from Dr. McMichael as well as further examination of EM. The military judge stated that “at no point was there a fragile theory of bias presented.” The military judge further noted that the proffered evidence “had very low probative value” and because there was a risk of confusing the panel, the evidence would be excluded under M.R.E. 403.
II. DISCUSSION
The right to confront and cross-examine witnesses and to call witnesses on one’s own behalf constitute the essential components of due process in a criminal trial. U.S. Const. amend. VI; Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The right of confrontation under the Sixth Amendment includes the “constitutionally protected right of cross-examination.” Davis v. Alaska, 415 U.S. 308, 316-17, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Cross-examination allows the accused to “expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.” United States v. Collier, 67 M.J. 347, 352 (C.A.A.F.2009) (omission in original) (quoting Davis, 415 U.S. at 318, 94 S.Ct. 1105). Military Rule of Evidence (M.R.E.) 608(c) “allows for evidence to show bias, prejudice, or any motive to misrepresent through the examination of witnesses or extrinsic evidence.” United States v. Moss, 63 M.J. 233, 236 (C.A.A.F.2006). “The partiality of a witness ... is *124 always relevant as discrediting the witness and affecting the weight of his testimony.” Id. (quoting Davis, 415 U.S. at 316, 94 S.Ct. 1105) (omission in original) (quotation marks omitted). The weight and credibility of a witness’s testimony are issues for the members of the panel to decide. United States v. Bins, 43 M.J. 79, 85 (C.A.A.F.1995).
The military judge may place reasonable limits on cross-examination to avoid problems such as unfair prejudice, harassment, and repetitive or only marginally relevant interrogation. See Collier, 67 M.J. at 353 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Under M.R.E. 403, the military judge may exclude relevant evidence “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
On appeal, the first granted issue addresses the military judge’s exclusion of evidence concerning EM’s prior mental health history, focusing on the relationship of the proffered evidence to the defense theory that EM had a motive to fabricate. The second granted issue concerns the exclusion of evidence which the defense sought to introduce in rebuttal of the prosecution’s claim that Appellant lied to witnesses regarding EM’s use of medication in order to protect himself from punishment.
A. ISSUE I: EXCLUSION OF EVIDENCE CONCERNING THE COMPLAINANT’S MOTIVE TO FABRICATE
Under M.R.E. 608(c) a defendant has the right to present evidence which shows bias, prejudice or a motive to lie. In this ease EM and Appellant were the only two people present during the circumstances constituting the charged offenses. The other witnesses presented by the prosecution arrived on the scene in the aftermath of those circumstances. In that context, the credibility of EM formed a critical component of the prosecution’s case.
The majority contends that Appellant did not establish the relevance of the evidence at trial. I respectfully disagree. Defense counsel at trial set forth two viable grounds for presenting the court-martial panel with information concerning a motive to lie. First, the proffered evidence showed that EM was a troubled young woman with dysfunctional coping skills whose psychological problems involved a competition for the attention of her mother. Defense counsel sought to introduce evidence that would enable the court-martial panel to consider whether fabricating a rape and assault allegation provided a means of getting attention from her mother.
Second, the defense sought to introduce evidence that would permit the court-martial panel to consider whether EM had a motive to lie based upon fear of hospitalization if her mother found out that she had another episode of self-mutilation. To support this theory the defense proffered evidence that EM’s mother had reluctantly considered residential treatment in the past. The majority concludes that the evidence was not relevant because the defense did not show that EM had a contemporaneous fear of hospitalization or that the mother contemplated hospitalization in the future. Those matters go to weight, not relevance. The defense proffered evidence of past contemplation of hospitalization based upon self-mutilation. The evidence was not so remote in either time or detail as to be irrelevant or otherwise excludable under M.R.E. 403. The responsibility for assessing EM’s credibility in light of that evidence rested with the members, a function that they could not perform due to the exclusion of the evidence by the military judge. See Bins, 43 M.J. at 85.
The military judge compounded the error by prohibiting the defense from questioning EM about the possibility that her wounds were caused by self-mutilation unless the defense could produce additional evidence that EM was the source of her own injuries. EM was the only prosecution witness to provide direct testimony about the details of the charged offenses. In that context, the military judge erred by prohibiting the defense *125 from asking a person with a history of cutting herself the questions pertinent to whether her injuries on the day in question could have resulted from yet another incident of self-mutilation.
The exclusion of the evidence constituted prejudicial error. The defense, through other evidence, directly challenged EM’s credibility by showing that she had made statements pertinent to the proceedings that were inconsistent and perhaps untruthful. The military judge’s rulings, however, meant that the defense could not place those matters in proper context. If the defense had been able to explore EM’s motive to lie, a reasonable panel might have reached a different conclusion about EM’s credibility.
B. ISSUE II: THE EVIDENCE OF PRIOR MEDICATION
The prosecution opened the door to the discussion of medication when it accused Appellant of lying to the other witnesses about EM needing medication. The prosecution’s reference to Appellant’s statement was neither inadvertent nor incidental. The prosecution first referred to Appellant’s comment in its opening statement, asserting that on the day in question EM was not on medication. The prosecution repeatedly elicited testimony about Appellant’s statement and EM’s claim that she was not on medication from virtually every witness presented during the prosecution’s case-in-chief. EM testified that she believed that Appellant had told people that she was on medication to make her seem unstable. In closing, trial counsel focused on Appellant’s statement and told the panel:
The accused lied about her being on medication. He lied ... because [EM] was not on medication. You heard that from [EM] herself, and you heard it from her mother. She was not on any medication that day. This is a lie concocted by the accused to extract her from that situation so that he would not get caught.
The prosecution presented Appellant’s statement as a lie to protect himself. The military judge recognized that in the absence of additional information it would appear that Appellant had made the story up out of the blue, but nonetheless the military judge refused to allow Appellant to respond to this assertion.
If not excluded by the military judge, there would have been sufficient evidence on the record for the members to consider whether Appellant had a reasonable basis for believing that EM’s behavior on the day of the charged incident resulted from medication. The record contained evidence that Appellant was related to EM’s family and that he had lived for a time in the family household. Dr. McMichael testified that EM’s psychological problems had been ongoing since 2002. He further testified that he had last prescribed medication in 2005, which would have called into question EM’s testimony that she had last been on medication in 2003. Dr. McMichael also noted that EM had been non-compliant with regard to the medication, taking it properly at some points and not taking it at other times. The issue of when EM was last on medication goes to weight not relevance. The proffered testimony made clear that EM had been on medication for a period of time spanning years. In light of that evidence, the responsibility for deciding whether Appellant had a reasonable belief that EM was taking medication in the period close to the incident, and that he believed her behavior resulted from failure to adhere to a medication regime, rested with the members, not the military judge. Allowing the prosecution to repeatedly brand Appellant’s statement as a lie, while simultaneously precluding him from introducing evidence showing a basis for that statement, constituted prejudicial error.
III. CONCLUSION
The military judge committed prejudicial error by precluding Appellant from presenting evidence and engaging in cross-examination pertinent to the credibility of the only person who testified as to the details of the charged offenses. I would set aside the findings and sentence and authorize a rehearing.