UNITED STATES, Appellee

v.

Geoffrey L. SULLIVAN, Sergeant
U.S. Marine Corps, Appellant

No. 10-0383

Crim. App. No. 200900148

United States Court of Appeals for the Armed Forces

Argued December 13, 2010

Decided June 8, 2011

BAKER, J., delivered the opinion of the Court, in which
STUCKY and RYAN, JJ., joined. EFFRON, C.J., filed a
separate dissenting opinion, in which ERDMANN, J., joined.


Counsel

For Appellant: Major Jeffrey R. Liebenguth, USMC (argued);
Lieutenant Michael E. Maffei, JAGC, USN.

For Appellee: Captain Robert E. Eckert, USMC (argued);
Colonel Louis J. Puleo, USMC, and Brian K. Keller, Esq. (on
brief).

Military Judges: E. H. Robinson and T. J. Sanzi


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

United States v. Sullivan, No. 10-0383/MC

Judge BAKER delivered the opinion of the Court.

A general court-martial composed of members convicted Appellant, contrary to his pleas, of carnal knowledge, two specifications of assault consummated by a battery, assault with a means likely to produce death or grievous bodily harm, communicating a threat, and kidnapping, in violation of Articles 120, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928, 934 (2006). The adjudged and approved sentence included confinement for six years, reduction to pay grade E-1, forfeiture of all pay and allowances, and a dishonorable discharge.

On review, the United States Navy-Marine Corps Court of Criminal Appeals affirmed.[1]

We granted review of the following issues:

> WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY EXCLUDING RELEVANT EVIDENCE THAT SHOWED THE ALLEGED VICTIM HAD A MOTIVE TO FABRICATE HER STORY.

> WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY EXCLUDING EVIDENCE EXPLAINING WHY APPELLANT TOLD WITNESSES THAT THE ALLEGED VICTIM HAD NOT TAKEN HER MEDICATION, LEAVING THE MEMBERS WITH THE UNREBUTTED IMPRESSION THAT APPELLANT LIED ABOUT HER NEED FOR MEDICATION TO PROTECT HIMSELF AGAINST ALLEGATIONS OF MISCONDUCT.

For the reasons stated below, we conclude that the military judge did not abuse his discretion.

---

[1] United States v. Sullivan, No. NMCCA 200900148, 2010 CCA LEXIS 19, at *18, 2010 WL 520821, at *6 (N-M. Ct. Crim. App. Feb. 12, 2010).

2

BACKGROUND

Appellant did not testify at trial.  Therefore, the evidence of events within quarters on Camp Pendleton derives entirely from the victim EM's testimony.  However, the facts that were in evidence or in the record for the purposes of assessing the military judge's rulings also derive from physical evidence of the victim's injuries, witness testimony involving events outside quarters on Camp Pendleton, as well as any permissible uses of Appellant's initial statement to investigators.  It also includes the portions of EM's medical records, testimony of EM's mother, and testimony of Dr. Herbert McMichael that were admitted during the Article 39(a), 10 U.S.C. §839(a) (2006), session conducted for the purpose of assessing Appellant's proffer of evidence.

EM was a minor who lived on the Cahuilla Indian Reservation in California.  As a child, EM experienced a number of family traumas:  her maternal grandfather shot and killed her mother's boyfriend, and her younger sister and cousin were killed by a drunk driver (the drunk driver was also EM's cousin).  In the wake of these events and because her mother caught her using marijuana, EM entered psychological therapy around age twelve:  she saw a psychologist associated with Indian Health Services, Dr.

3

McMichael, an average of seven times per year from 2002 to 2007.

EM identifies Appellant as her cousin. In June 2005, there was an incident that predated the charged offenses. EM was visiting Appellant at his house in Hemet, California, about forty-five minutes from the reservation. EM was fifteen. EM testified that Appellant "forced [her] to have sexual intercourse with him." This was the basis for the carnal knowledge specification under Article 120, UCMJ.

The event resulting in the other charges occurred approximately two years later, in September 2007. September 22, 2007, was EM's seventeenth birthday, and EM had a barbeque with family at her house. Appellant could not attend. However, Appellant called EM ten to fifteen times and texted her about fifty times until she answered. According to EM, Appellant asked her to go to a movie with him; when she declined his offer, he "said that if I didn't go to the movies, he would show up at my house and he would kill me." EM agreed to go to the movies.

EM met up with Appellant the next day at a motocross race. Appellant texted her that he was "parked behind a bike trailer." He refused her mother's request to say hello and drove off when EM got in the car. They stopped

4

for fast food.  As Appellant ate in the car, EM informed Appellant that she had told her mom to meet them at the movie theater, and he seemed "a little bit upset" at this.

Appellant then told EM that he was feeding the dogs for his Officer-In-Charge at Camp Pendleton.  Entering Camp Pendleton, military police pulled over Appellant and gave him a ticket.  As Appellant pulled into the driveway, EM said she wanted to wait in the car while he fed the dogs, but he "was getting angry" and told her to go inside.  A neighbor approached as they were entering the house and said that the dogs had been fed and "taken care of." Appellant then told EM that the neighbor "took care of [the dogs] on weekends."  This prompted EM to ask "what we were doing here," and "he wouldn't answer."

At this point, EM testified, "I was nervous and scared."  Appellant went in the living room, sat on the couch and began watching TV.  EM stated she wanted to leave, and then yelled that she wanted to leave.  Appellant "told [EM] that we weren't going to leave until we did something."  EM testified, "I think [it] meant he wanted to perform some kind of sexual activity with me."  EM's sister called and EM answered; Appellant got angry and told her to hang up.  When she was off the phone, Appellant repeated that "we weren't leaving till we did something."

5

EM said she "tried walking out the front door" but "[Appellant] had grabbed the back of my sweatshirt and pulled me down to the couch . . . . He had throw[n] his shorts off and tried pushing my head . . . . [h]e put it around the back of my neck and pushed -- pushed my head down." According to EM, he had pulled his shorts "almost midthigh" and his boxers down. EM made a run toward the front door, but it was locked and she didn't get it open in time. Appellant grabbed her "[l]ike in a headlock" and dragged her down the hallway. EM rated his use of force as an "eight or nine" on a scale of one to ten.

As he dragged her down the hallway, Appellant "had pulled the hood from my sweater over my face and held . . . one of his hands down on my nose and my mouth and the other hand around my neck." EM testified that she "thought he was trying to kill me. And I thought I was going to die." She testified that she dialed 911 in her pocket but lost consciousness, and when she came to, Appellant took the phone from her hand and hung up before she could say anything. EM ran to the bedroom and reached for the window, but Appellant pulled her away; Appellant told her to be quiet or he was going to kill her.

Appellant walked out of the bedroom; EM was trying to stand, leaning over a dresser. He came back to the room

6

with a knife in his hand.  First, according to EM, he held the knife to EM's neck and "told me that, if I wasn't going to be quiet, that he was going to kill me."  Then he offered EM the handle "[a]nd he told me that . . . if I was going to tell someone what he had done then just to kill him."  Appellant seemed "scared" and "like he wanted to cry."

EM testified that at this point she ran for the door. She got it unlocked, opened it, and Appellant grabbed her again in a headlock, locked the door, threw EM to the floor and when she stood up, punched her in the mouth.  She stood up and walked toward the third bedroom, trying to push Appellant away.  He hit her head on the corner of a tall dresser.  Appellant subsequently told EM to get in the car. She was afraid that "he'd do something like maybe get us in a car wreck or something and try to kill both of us.  I still didn't think he was going to let me live that day." They walked through the house toward the driveway and he discussed what EM should tell her mom to explain her unanswered calls.  When he opened the passenger door for EM, she ran down the street until she "saw a lady.  And I asked her to help me.  And I just kind of collapsed on the -- on the grass area.  I think it was someone's yard."

7

The lady EM saw was Eileen Taylor, a neighbor who was on a walk with her young children. When EM collapsed, Taylor, who had previously worked as a registered nurse, kneeled over her. Other neighbors saw them and came outside. Witnesses described EM as "hyperventilating," "eyes rolled in her head," and saying, "[h]e hurt me."

Appellant watched EM from down the street and then drove over in his car. Appellant told Lieutenant Colonel (Lt Col) Kenneth Maney and his wife, neighbors who were among the bystanders, that "she missed a series of her meds" and attempted to persuade EM back into the car. Lt Col Maney testified that EM "made it clear to me that [she thought] he would hurt her." As the situation progressed, "her health was starting to deteriorate" and they "couldn't get a pulse on her." Lt Col Maney and the other bystanders called EM's mother and then the Provost Marshal's Office, which sent military police and an ambulance. Military police questioned Appellant at the scene as the ambulance took EM to the hospital.

The defense argued at trial that EM was mentally unstable and "fabricated the allegations against Cpl Sullivan because she attempted to mutilate herself and had suicidal ideations on 23 September 2007." According to Appellant, EM feared that her mother would send her to be

hospitalized if her mother discovered the true source of her injuries as self-inflicted or having occurred during Appellant's attempt to stop EM's self-injury.  Appellant further argued that EM's condition was prone to triggering events, like birthdays, and cyclical in nature, making past behavior relevant to current conduct.  To support this defense, Appellant sought to present evidence of EM's prior self-mutilation and "suicidal ideations" allegedly discussed with Dr. McMichaels during her prior treatment and recorded in her medical records.[2]

---

[2] "Suicide ideation," according to psychologist Dr. McMichael, who introduced the term to this case, "doesn't involve intent.  It does not involve a plan."  Rather, suicidal ideation involves thoughts that are "not unusual for daily life for healthy people."  Dr. McMichael described a continuum ranging from mere suicidal ideations to someone at high risk of suicide, who is developing an intent and a plan, which is "much different from a suicidal ideation."  For example, Dr. McMichael offered, "if I had an automobile accident and I crush up my wife's car and said, Oh, my goodness.  I wish I were dead. . . . She's going to read me the riot act.  That's an ideation."

The term self-mutilation, as used by Dr. McMichael in his proposed testimony, is distinct from suicide ideation. He testified, "[s]elf-mutilation is a coping skill.  It's a dysfunctional coping skill, but it's nonetheless an effective coping skill."  Discussing self-mutilation, Dr. McMichael noted:

> It reduces the psychological pain that the person is having.  And it's a cut across the arm.  Cutting is a cut across the arm.  When they start cutting down the arm[s] that's no longer cutting, that's a suicide attempt.  So that's not cutting, that's not self-mutilation.  And cutting across the thighs is typical

The military judge called an Article 39(a), UCMJ, session to determine the admissibility of Dr. McMichael's proposed testimony, particularly regarding EM's past medication prescriptions and history of self-mutilation or "suicide ideation."  He concluded that it did not meet the relevancy requirement and that any relevance was outweighed by potential prejudice pursuant to Military Rules of Evidence (M.R.E.) 401 and 403.  He also ruled inadmissible the defense's cross-examination of EM and her mother on the subject of her past suicide ideation, self-mutilation, and medications.  The military judge stated on the record that he excluded this evidence based on failure to establish a relevant connection to the case (from which members could draw permissible inferences).

Because these subjects were repeated and because the military judge invited the defense counsel to revisit the topic or recall witnesses if they could establish relevance, the record contains multiple discussions with counsel and rulings by the military judge.[3]  Ultimately, the

_____

of someone who has had a lot of trauma in their life, as well as cutting across the arms.

[3] The military judge held:

Defense counsel characterizes this evidence as bias.  When it appears that what this actually is, is character evidence to show action and

conformity there with [sic]; that is, [EM]
exhibits these traits, does these things, is this
type of person, and she was this type of person
on September 23, 2007.

He based this on prior examinations in which he
stated:

I, again, am not going to allow you to get into
her suicide ideations or self mutilation. . . .
[F]irst off, . . . I have not heard the
relevance.  I have asked both sides a couple
times.  I have not heard the relevance of it.  So
that is number one.

Number two, I see no way that the government has
somehow opened the door on this issue by either
direct or otherwise.

Whatever relevance there may be there, if there
is any, I would say that under 403 that this type
of evidence must be kept out in order to not
confuse the members or to get in improper
evidence on the alleged victim that is not
relevant to these charged offenses.

He later gave the defense counsel another opportunity:

Connect for me the embarrassment of self
mutilation and the threat of residential
treatment to making up these allegations.

. . . .

. . . [S]how me the linkage of how that would go
to show her making false allegations against the
accused.

. . . .

. . . What evidence is on the record right now
that she injured herself?

. . . .

military judge detailed his decisions in written findings of fact and conclusions of law rooted in M.R.E. 401 and M.R.E. 403.

> [T]he [C]onstitution does not confer upon the accused a right to present any and all evidence at trial, but only the evidence which is legally and logically relevant.
>
> . . . .
>
> . . . [E]vidence that the defense sought to elicit here was not bias, because at no point was there a fragile theory of bias presented. . . . Under 403, in doing an analysis, a balancing analysis on this issue, I found that the evidence that the defense was trying to admit . . . had very low probative value.
>
> . . . Conversely, the danger that the members would misuse the evidence and use it for an improper purpose or . . . distract from the main issue in the case was very high.

On appeal, Appellant argues that he was denied the opportunity to put on a defense because EM's mental health records were relevant and central to his claim that EM's injuries were self-inflicted and that she had a motive to

---

> . . . [W]hat evidence is on the record that she injured herself? Is there something on the record?

When the defense counsel was unable to demonstrate a connection, the military judge stated:

> [Y]ou can't just pull out something that happened six months ago and say, Ha, we're going to bring this in. There's got to be some connection. There's got to be some relevancy to the charged offense. And right now there's nothing in the record that shows that.

fabricate. Appellant further argues that the military judge violated his constitutional right to confront witnesses because the military judge restricted the admission of evidence that went toward EM's credibility based on her psychological history.

## DISCUSSION

This Court reviews a military judge's evidentiary decisions for an abuse of discretion. United States v. Ediger, 68 M.J. 243, 248 (C.A.A.F. 2010).

## Issue I: Evidence of Motive to Fabricate

The Confrontation Clause preserves the right of an accused "to be confronted with the witnesses against him." U.S. Const. amend. VI; United States v. Carruthers, 64 M.J. 340, 344 (C.A.A.F. 2007). This right includes the right to cross-examine witnesses, including on issues of bias and credibility. In fact, "This Court has held that rules of evidence should be read to allow liberal admission of bias-type evidence." United States v. Moss, 63 M.J. 233, 236 (C.A.A.F. 2006).

At the same time, a military judge retains "wide latitude" to impose "reasonable limits" upon cross-examination. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986), quoted in Carruthers, 64 M.J. at 341. Moreover, evidence must satisfy the rules of evidence. An accused

13

does not have a right to cross-examine a witness on any subject solely because he describes it as one of credibility, truthfulness, or bias.  There must be a direct nexus to the case that is rooted in the record.  That is, the evidence must be logically relevant as required by M.R.E. 401, and it must also be legally relevant in accordance with the M.R.E. 403 balancing test.  In short, the right to cross-examine is the right to question where the proffer establishes a real and direct nexus to a fact or issue at hand.  That nexus is as important where the concern involves inquiry into the victim's medical background and privacy as it does when it involves traditional M.R.E. 403 concerns like distraction and confusion of the members.

In our view, the military judge did not abuse his discretion in ruling that Appellant did not establish such a nexus in this case.  First, Appellant's theory of admission was based in part on the prospect that EM feared hospitalization if her mother believed she had sought to injure herself.  However, there is no evidence in the record that EM contemplated the possibility of hospitalization.  There is also no evidence that EM's mother would consider hospitalization in the case of a future cutting incident.  Significantly, defense counsel

14

did not question EM or her mother on this subject at trial
-- nor did the military judge preclude defense counsel from
doing so.  (To his credit, Appellant's counsel acknowledged
as much at oral argument.)  The mere fact of prior
psychological counseling does not create a sufficient nexus
to inquire into a victim's medical history.  A direct nexus
is needed.

Further, EM's injuries were not similar to those Dr.
McMichaels described as associated with EM's prior self-
mutilation through cutting.  At one point, the military
judge asked defense counsel:  "[I]s there anything on the
record that shows that she did these injuries? . . . I just
want to be certain about that."  Defense counsel responded
by acknowledging the question and stating, "[N]o, sir."
Subsequently, the military judge found "the injuries were
marks to her neck and a cut lip, which in no way was ever
presented as something that she had done to herself."
Again, there is no direct nexus that would open the door to
inquiry regarding the victim's mental health counseling for
cutting.

As a result, this case is distinguished from Moss, 63
M.J. at 238-39, a case Appellant cites, in which this Court
reversed the trial court's decision to exclude testimony
regarding the victim's mental health records and history.

15

To start, Moss was a "'he said/she said' scenario." Id. at 237. The testimony of the accused and the victim stood alone and "[t]here was no other evidence to corroborate the sexual misconduct." Id. In contrast, in this case there were witness bystanders who testified to the circumstances immediately following the incident as well as evidence of EM's physical injuries, which tended to corroborate EM's testimony.

In Moss, there was also a direct nexus between the proffered evidence and evidence on record at trial. Id. The victim had been repeatedly punished, beaten, and institutionalized "as a result of behavior problems and suicide attempts," contemporaneous with the events in question. Id. at 235. The record also reflected that the victim had lied to her mother, school officials, and mental health professionals, for which there was evidence in her mental health records. Id. As a result, this Court recognized a "viable defense theory as to why KLVD would fabricate the rape allegations," because "KLVD had a motive to misrepresent the event with Appellant in order to change her own present circumstances," and alter the context of her relationship with her mother. Id. at 235, 237. The Court concluded, "[a] reasonable panel might have reached a significantly different impression of [the victim]'s

16

credibility had the defense been able to present the excluded evidence." Id. at 237. Thus "the military judge's exclusion of the proffered evidence denied Appellant his fundamental right of confrontation and cross-examination." Id. at 236. This case is not Moss; Appellant did not provide the factual predicate necessary to create a sufficient nexus between EM's previous mental health issues and counseling and Appellant's theory of admission to overcome the M.R.E. 403 balancing test.[4]

Further, and important to our reasoning, Appellant was given the opportunity to demonstrate such a nexus. First, all of the records of EM's visits with Dr. McMichael were available to Appellant, and the defense was able to question Dr. McMichael out of the presence of the members to attempt to show the relevance of his proposed testimony.

Second, the military judge repeatedly conducted balancing tests, on the record, in light of M.R.E. 401 and

---

[4] The military judge specifically concluded:

> So I felt the probative value of this evidence was extremely low. Conversely, the danger that the members would misuse the evidence . . . was very high.
>
> . . . .
>
> . . . [A] link that was missing in the defense theory here was that evidence that somebody who suffers from adjustment disorder with mixed emotions and post traumatic stress disorder would react in the way that the defense presented.

17

M.R.E. 403.  Appellant had the opportunity to make his case, the military judge stating on at least three occasions that if the defense was able to produce evidence that would demonstrate a connection, he would revisit the topic.  In short, the military judge treated the relevance and balancing determinations with the care necessary to uphold the accused's constitutional rights while also protecting the privacy of the victim and did not abuse his discretion in doing so.[5]  Therefore, we are satisfied that the military judge considered the M.R.E. 403 factors and the probative value of this evidence, and did not abuse his discretion.

Issue II:  Medication Evidence

The second issue is related to the first because it also tests the balance between an accused's right to confront witnesses and put on a defense and a witness's medical and personal privacy.  It, too, presents a question of legal and logical relevance as to whether Appellant demonstrated a sufficient nexus between his proffered

---

[5] See United States v. Collier, 67 M.J. 347, 353 (C.A.A.F. 2009) (to constitute an abuse of discretion, a military judge's ruling "must be more than a mere difference of opinion; rather, it must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous" (quotation marks omitted)).

evidence regarding EM's past use of medication and a fact or issue at trial.

The defense sought to introduce evidence of EM's prescribed medications history prior to 2007, in particular during the years 2002, 2003, and 2005. The defense argued that it was necessary to show why Appellant told the bystanders that EM had "missed her medication" as an explanation for her behavior on the day of the incident. Appellant argues that because he was aware of EM's prior medication, he might reasonably have thought she was still on medication at this later time. In the alternative, Appellant argues that trial counsel opened the door to this evidence by eliciting testimony that EM was not on medication at the time of the incident, and thus the military judge abused his discretion in excluding the evidence.

As with the first issue, the military judge excluded this evidence based on a lack of logical relevance. The military judge found that there was no evidence on the record that showed that EM was on medication at the time of the incident. Neither was there evidence before the court that Appellant believed EM to be on medication in September

19

2007.[6]  To the contrary, the record contained EM's testimony
that she was last on medication in 2003.  Moreover, EM's
testimony is consistent with Dr. McMichael's testimony
during the Article 39(a), UCMJ, session that EM had not
been on medication for a number of years -— he testified
that his last prescription for EM was in 2005.

Thus, in our view, the military judge correctly
determined that Appellant's statements at the scene that EM
needed her medication, made inquiry about EM's use of or
lack of medication in 2007 relevant.  But it did not make
her history of medication in prior years relevant, absent
some showing that such prior medication would affect her
ability to perceive events or tell the truth at a later
time.

Evidence of a witness's psychological state is
properly excluded if it did not affect her "ability to
perceive and tell the truth."  United States v. Butt, 955
F.2d 77, 83 (1st Cir. 1992).  Conversely, it should be
admitted if it relates to the witness's ability to perceive
events and testify accurately.  United States v. Lindstrom,
698 F.2d 1154, 1165-66 (11th Cir. 1983).[7]  As with Issue I,

---

[6] The lower court noted this as well.  2010 CCA LEXIS 19, at
*8, 2010 WL 520821, at *3.
[7] In Lindstrom, "medical records showed that a government
witness had manipulated the results of a medical test and

the problem here is one of establishing a sufficient nexus to satisfy the requirements of M.R.E. 401 and especially M.R.E. 403.

In Butt, the witness had attempted suicide and been hospitalized; her hospital records revealed diagnoses of "splitting," "hysteroid dysphoric," and "borderline personality disorder." 955 F.2d at 80. Nevertheless, the United States Court of Appeals for the First Circuit affirmed the trial court's decision to exclude her mental health records as "not relevant to her veracity" because "a tighter logical nexus was necessary to justify the introduction of such personal and potentially stigmatizing material." Id. at 83-84. Similarly, in the words of the military judge in the present case, "The girl is 17 years old and everyone's been on medication."

Appellant retained a number of avenues through which to attack EM's credibility, which he did. For instance, defense counsel introduced testimony of MP, a former friend of EM, and her mother DJ, who testified to EM's lack of truthfulness and implied that she had fabricated her testimony. Ultimately, however, Appellant failed to

---

woven an 'intricate fabrication' to explain it, that the witness 'chronically misinterpreted the words and actions of others,' and that she exhibited 'pseudoneurotic schizophrenia with marked paranoid trends.'" Butt, 955 F.2d at 83 (quoting Lindstrom, 698 F.2d at 1164-65).

establish a sufficient nexus between his statement and inquiry into EM's prior medical history and records or prescriptions to survive the balancing test provided in M.R.E. 403.  The military judge did not abuse his discretion in restricting the admission of evidence of EM's self-mutilation, suicide ideation, or past use of medication.

CONCLUSION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

United States v. Sullivan, No. 10-0383/MC

EFFRON, Chief Judge, with whom ERDMANN, Judge, joins (dissenting):

In a contested trial, a court-martial panel convicted Appellant of offenses against his minor cousin, EM, including assault consummated by a battery, carnal knowledge, communicating a threat, and kidnapping. The evidence against Appellant regarding the details of the charged offenses consisted primarily of the testimony of EM. The prosecution also offered corroborating evidence, including the testimony of persons who observed Appellant and EM in the aftermath of the incident forming the basis for most of the charged offenses. The prosecution sought to demonstrate that Appellant had attempted to deceive the witnesses to the subsequent events in order to shield himself from potential charges.

At trial, the defense vigorously challenged the prosecution's case, contending that the allegations had been fabricated by EM. In support of that position, the defense sought to introduce evidence demonstrating EM's motive to lie. In addition, the defense sought to introduce evidence in rebuttal of the prosecution's claim that Appellant had lied about EM's medical situation in the aftermath of the incident. The military judge restricted Appellant in presenting both forms of evidence. The majority concludes that the military judge did

not err in either respect.  For the reasons set forth below, I respectfully dissent.

## I.  THE COMPETING THEORIES OF THE PARTIES AT TRIAL

### A.  OPENING STATEMENTS

The prosecution, in its opening statement, told the members that the evidence would show that Appellant drove EM "to his Officer-In-Charge's [OIC's] house on board Camp Pendleton.  And in that house, he attempted to force her to perform oral sex on him.  When she refused, he assaulted her repeatedly, confined her wrongfully in that house, and threatened her life."  Trial counsel also contended that Appellant had sexual intercourse with EM two years prior to the Camp Pendleton incident, while EM was fifteen years old.  The prosecution stated that these charges would be supported "first and foremost" by EM and that her testimony would be supported by witnesses from near the Camp Pendleton home and law enforcement officers who responded to the event.

The defense, in its opening statement, contended that the case was "about lies made by an emotionally disturbed teenager, seeking attention."  Counsel described EM as having a lot of troubles in her life and noted that she had first begun receiving psychological treatment in 2002.  As late as March 2007, six months before the accusations were made against

Appellant, she had received psychological treatment because, "she wanted to kill herself, and she had been cutting herself."

The defense asserted that on the day in question Appellant and EM had agreed to see a movie. Before going to the movie, Appellant wanted to check on his OIC's home and take care of the dogs, since he was house-sitting for the warrant officer. While Appellant was taking care of the dogs, EM went to the bathroom. EM allegedly grabbed a knife owned by the OIC and threatened to kill herself. Appellant was surprised but wrestled the knife away from EM, who was having an "emotional breakdown" and repeatedly telling Appellant to get away from her. Appellant tried to settle her down and when he thought she was calmed down enough he tried to take her back to her mother. Rather than get into Appellant's car, EM wandered down the street in "an emotional frenzy" collapsing in a nearby lawn.

B.   TESTIMONY ABOUT THE CHARGED OFFENSES

1.  Testimony by EM on direct examination

The prosecution called EM as its primary witness. At the time of the trial, in 2008, she was seventeen years old. EM testified she had known appellant for seven or eight years and that he had lived with her family in the past. EM stated that Appellant compelled her to have intercourse with him in 2005, but she did not tell anyone at the time of this event. EM then described a separate incident in September 2007, which began

3

when she reluctantly agreed to go to a movie with Appellant after he threatened EM with harm to her family.

She testified that after Appellant picked her up in his car, they did not go to the movie. Instead, Appellant told her that "he had to go to Camp Pendleton to feed his boss's dogs." After arriving at the house in Camp Pendleton, EM repeatedly requested that they leave and Appellant grew increasingly angry. At some point EM attempted to leave through the front door, when Appellant allegedly attacked her by grabbing her clothes and pulling her onto the couch. According to EM's testimony, Appellant lowered his shorts and attempted to force her head towards his penis. EM got loose and headed for the front door again. Her testimony detailed a struggle with Appellant in which Appellant allegedly choked her, threatened her with a knife, and struck her. After striking her, Appellant allegedly asked her to get in his car and promised that he would take her to her mother and that she would never hear from him again. EM testified that she did not believe Appellant, but agreed to go along with him. When they got outside to Appellant's car she ran, eventually collapsing when a woman asked her if she needed help.

The prosecution also elicited testimony from EM that she was not on medication on the day in question, and she testified that she had not been on medication since 2003. EM stated that

she believed Appellant told the witnesses that she was on medication in an attempt to make her appear "naturally unstable."

2.  Restrictions on the defense cross-examination of EM

During cross-examination, defense counsel attempted to ask EM questions about her past trauma, psychological condition and self-mutilation.  Trial counsel objected.  In the ensuing hearing before the military judge under Article 39(a), UCMJ, 10 U.S.C. § 839(a), defense counsel offered the following explanation for cross-examination of EM:

> Sir, on direct examination, the government was asking questions about her state of mind.  They've asked if she has been prescribed medication. . . . This goes to whether Corporal Sullivan's belief that she was on medication was reasonable or not.

Counsel added that the cross-examination would "show the members why [the defense] theory of the case [was] reasonable."  The military judge rejected the defense position, stating that the prosecution had not "opened the door" to this line of questioning.  The military judge added that he did not "see the relevance of talking about her psychological issues."

The defense then sought to address the issue of self-mutilation, explaining the defense theory "that this young lady picked this knife up and she tried to injure herself."  Defense counsel contended, "That is how she got injured.  And there is

5

evidence that she -- "  The military judge interrupted and stated that the defense had not presented that theory earlier in the trial, and that merely mentioning the theory did not mean that the defense was entitled to discuss the matter.  The military judge asked defense counsel to articulate why self-mutilation in 2003 would be relevant to the circumstances of the charged events in 2007.  Defense counsel noted that EM had stated during the pretrial hearing under Article 32, UCMJ, 10 U.S.C. § 832, that her last self-mutilation occurred in 2005, and there was evidence of self-mutilation in 2007.  The defense stated that it wanted to confront the witness with statements made to her psychologist as a means of addressing credibility.  The defense also wanted to contrast the evidence of self-mutilation with her testimony denying any suicidal tendencies.

In response to the military judge's questions about the relevance of this evidence, defense counsel offered two reasons:

> [One:] Our entire theory of the case is that this entire event occurred because she was having suicidal ideations.  She picked up the knife and was going to cut herself, number one.  So it goes to [Appellant's] right to compulsory process.

> Number two, it is relevant to show that at the Article 32 these matters were brought up, and she testified falsely about them.

In support of this view, defense counsel pointed to conflicts between EM's testimony during the pretrial Article 32 hearing and other statements by EM, as reflected in a medical report

6

from EM's psychologist.  The military judge ultimately concluded that the evidence was neither inconsistent nor relevant, and that in any case should be excluded under M.R.E. 403 as likely to confuse the members.

During the subsequent cross-examination of EM, defense counsel asked a number of questions about inconsistencies in EM's testimony.  The cross-examination indicated that EM had told one investigator that she had been raped by Appellant four times, while providing different numbers to other individuals.  During cross-examination, the defense also was able to establish that EM had acknowledged, during the pretrial Article 32 investigation, that she had made a false statement to one of the law enforcement investigators.

3.  The prosecution's evidence concerning developments in the aftermath of the charged offenses

a.  The witnesses who observed Appellant and EM

To corroborate EM's allegations, the prosecution offered the statements of a number of witnesses regarding events that occurred in the immediate aftermath of the incident forming the basis for the charged offenses.  Ms. Eileen Taylor testified that she was walking her two young children near the home of Appellant's supervisor when she observed a girl, EM, "walking down the street, sort of mumbling to herself."  Ms. Taylor

stated that EM said that she was "looking for her mother" and that EM looked "out of sorts, like she needed some help." EM collapsed onto a lawn when Ms. Taylor asked if she was okay. Ms. Taylor, a registered nurse, went to assist EM. She described EM as having a swollen lip, hyperventilating, being "terrified" and "a little bit disoriented."

While Ms. Taylor was assessing EM, other neighbors began to arrive on the scene. One of these neighbors testified that EM's emotional state was "[c]ompletely looped" and that she was "breathing heavy, eyes were rolling in her head, tears were going down her face. She was asking for her mom." The neighbor also stated that EM had a "fat lip" and "a red mark on the right side of her neck." All of the neighbors testified that after Appellant arrived at the scene, he endeavored to get EM into his car.

The witnesses also testified that Appellant made a statement about EM's condition. Specifically, they testified that Appellant told them that EM had missed her medication. EM told at least one of the witnesses that she was not on medication.

The witnesses testified that EM refused to go with Appellant. They further testified that EM told them that Appellant would hurt her.

One of the witnesses, Lt. Col. Maney, took informal control of the situation. He testified that when he arrived on the scene, EM was "pretty much incoherent." He also observed Appellant standing nearby on his cell phone with his car parked in the middle of the road. Lt. Col Maney described Appellant as, "trying to -- like anybody would if they were on [sic] a situation in base housing, trying to get her in the car, and let's just move on, let's move on from the scene."

After EM refused to get in the car with Appellant, Lt. Col. Maney suggested that Appellant call EM's mother. Appellant dialed the number and handed the phone to Lt. Col. Maney. When EM's mother told Lt. Col. Maney that EM was not on any medication, he decided that the situation was "out of [his] hands" and called the Provost Marshal's Office. Lt. Col. Maney testified that Appellant was cooperative and polite throughout the scene at base housing. He also testified that EM's mother became very emotional when he asked about EM's medication.

b.  The testimony of EM's mother

On direct examination of EM's mother, the prosecution asked if EM had said anything about medications during the phone conversation between EM and her mother while EM was on the lawn in base housing. When defense counsel objected, the prosecution indicated that the testimony would demonstrate that Appellant had sought to transform his crime into a benign incident by

fabricating an explanation.  According to the prosecution, the

testimony from EM's mother would show that Appellant had lied to

the other witnesses and that he "was trying to extract [EM] from

the situation by saying that she was on medications when she was

not."  The military judge did not rule on the defense objection,

but EM's mother was permitted to testify that EM was not on

medication on the day in question.

When the defense attempted to pursue the relationship

between the testimony of EM's mother and the credibility of

Appellant's statements in the aftermath of the incident, the

prosecution objected.  The prosecution asserted that questions

concerning EM's prior use of medications did not involve

evidence relevant to the case.  In response, defense counsel

noted that the prosecution had interjected into the case the

link between EM's prior use of medication and the assertion that

Appellant had fabricated an explanation for the incident.  The

defense expressed concern that the prosecution, in its closing

statement, would rely on the asserted false statement by

Appellant.

The military judge noted the defense point, stating:

I guess the point here is:  That standing alone.  It
could look like he's making this up out of the clear
blue as some story to tell these people that are all
around her.  If he had it in his head -- if he knew
she had been on medication, whatever, six months ago
or something, then this might go to show that he had

10

some knowledge that she had been on medication.  This
wasn't fabricated.

In response to the military judge's question as to the
details that the defense would try to elicit, defense counsel
responded:

> The government wants to have their cake and they want
> to eat it too.  They want to introduce [Appellant's]
> statement that she's on medication.  Then they want to
> prevent me from arguing that, and then argue to the
> jury that my client is a liar and he was trying to
> completely fabricate the story.

> They opened the door.  I didn't ask that witness that
> question on direct.  He opened the door.  I want to
> ask well, when was your daughter prescribed medication
> then, if she ever was?

The military judge indicated that he would allow the
defense to ask a single question as to whether EM had ever been
on medication.  Upon further objection from the prosecution, the
military judge limited the time frame of the question to
medication use within a year of the September, 2007, event.
Ultimately the military judge sustained the objection to the
defense counsel's general question:  "Was [EM] ever prescribed
medication in the past?"  The military judge concluded that such
questions would confuse the members:  "The girl is 17 years old
and everyone's been on medication.  I'm just not going to allow
it at this point."  The military judge left open the issue for
the defense case-in-chief but no further questions were asked

concerning EM's medication use or psychological history during cross-examination.

4. The testimony proffered by the defense concerning EM

During its case-in-chief, the defense sought to present testimony from Dr. Herbert McMichael who provided psychological services to EM. The defense contended that testimony would provide evidence concerning the source of EM's injury as well as her motive to fabricate.

In a session before the military judge under Article 39(a), the parties discussed the relevance of the proposed testimony. Defense counsel stated that the testimony would provide information concerning EM's history of suicidal ideation and self-mutilation. In addition, the defense stated that the evidence would show that EM's condition had been a source of conflict between EM and her mother, and that consideration had been given to placing EM in a facility for residential treatment. Counsel argued that the evidence would show that EM had a variety of motives to fabricate the allegations against Appellant, including a desire to gain sympathetic attention from her mother, and a fear of her mother's reaction if she knew that EM had engaged in further attempts at self-mutilation.

During the Article 39(a) session, Dr. McMichael stated that he had met with EM an average of seven times per year from 2002-

12

2007.  He stated that EM had a long history of suicidal ideation going back to at least 2002 when EM first started receiving treatment.  He described suicidal ideation as part of the continuum of suicidal thought and behavior, with suicidal ideation at one end of the continuum, while forming a suicidal intent or plan would be further along the spectrum.  According to Dr. McMichael's testimony, EM's last reported suicidal ideation occurred in March, 2007.

Dr. McMichael also discussed EM's history of self-mutilation.  Dr. McMichael distinguished self-mutilation from a suicide attempt, and described it as a dysfunctional coping skill.  "The agony that a person is experiencing, they're depressed, they're anxious, they feel in their chest, they think it and process it in their head."  The physical cutting "reduces the psychological pain that the person is having."  Dr. McMichael told the military judge that although the primary focus of self-mutilation involves a form of control, it also can have a secondary effect in terms of gaining attention.  His testimony described two major periods of self-mutilation by EM, occurring in 2005 and early 2007, and he indicated that there had been earlier self-mutilation.

Dr. McMichael said that he had discussed the possibility of hospitalization with EM's mother during the 2005 period of self-mutilation.  He said that EM's mother was "open to the idea, but

she really wasn't keen on the idea."  In his report, Dr. McMichael noted, "Mom realizing the need to consider alternative interventions for client including residential placement."  At that time, Dr. McMichael also discussed a "no suicide contract" with EM, which is an approach used when the doctor feels concerned that someone is "moving into the direction of high risk."  This is essentially a stated commitment by the patient to contact the doctor if personal thoughts turn to committing suicide; the commitment to the agreement itself is part of suicide prevention.  In March, 2007, the medical records indicated that EM was at moderate suicide risk.

In describing EM's family dynamic, Dr. McMichael testified, "Well, there was a theme that's emerged on and off throughout [EM]'s life.  Not feeling special enough to her mom, and when her mom gives someone else attention, it is upsetting for [EM]." He further noted that EM had a "love/hate" relationship with her siblings and her mother.  "Always competing for position in the family.  Always competing for attention and affection.  Always overly sensitive to being rejected by anybody in the family." Elsewhere he offered the following description of EM:  "This is a child who early in life was violated by numerous people and she never internalized a feeling of security and safety that a family can provide."  He continued, "She is always looking over her shoulder expecting something scary or bad to happen."  Dr.

14

McMichael noted the complexity of the family dynamic by stating that "they're always putting each other down and at the same time they're wonderfully supportive of one another." He also testified that EM's mother had started to take care of two more of EM's cousins, noting that while EM appeared to enjoy interacting with her cousins, it signaled reduced attention from her mom.

In describing EM's underlying psychological condition, Dr. McMichael noted EM's recent improvements in the months prior to the charged offenses. He added, however, EM's mental condition was like a "volcano" and pressure could build up at any time. He stated that EM's condition "cycles from mild to acute and from active to delayed." He explained that a trauma has a lasting psychological impact, "[s]o that the trauma that took place . . . [fifty] years ago is no less significant than the trauma that took place one year ago." Dr. McMichael also testified that in treating EM, he looked for "[t]riggers of depression." He further noted that during the summer of 2007 EM appeared the healthiest of her time in treatment. In response to a question from the military judge concerning the events of September 2007, Dr. McMichael testified that, "[t]here were no triggers prior to that event that would lead [him] to believe that [EM] would be wanting to hurt herself." He subsequently noted that individuals with EM's problems would be prone to

15

depression on holidays, birthdays, and anniversaries of deaths. He testified that times of celebration would remind EM of family members who were not there anymore but also expressed particular concern for anniversaries of deaths, such as the October 2003 death of EM's sister. He noted that any of these events could serve as triggers. The defense had previously elicited testimony that EM's birthday occurred the day prior to the alleged events in the Camp Pendleton home.

During the Article 39(a) session, Dr. McMichael also described EM's history regarding usage of medication. The record is not clear on the time lines for specific medications, but the doctor testified that he prescribed two different psychiatric medications at different periods of time. He noted that her last prescription occurred in 2005. Dr. McMichael testified that EM had never been compliant: "She would take them for a little while and then she wouldn't take them."

After the proffered testimony, defense counsel explained that they wanted to introduce this testimony as evidence of self-mutilation, suicidal ideation, and EM's family dynamic. Defense counsel presented two theories of relevance for this particular testimony.

Under the first theory of relevance, the defense sought to demonstrate that EM may have been the source of the injuries that occurred inside the house at the time of the charged

offenses.  The military judge asked if there was any other evidence in the case, outside of the proffered testimony, that EM was the source of the injury.  Defense counsel stated that there was no other evidence that EM had inflicted the injuries on herself, but noted that the source of the injuries was an issue in dispute in the case.

Under the second theory of relevance, the defense cited the issue of whether EM had a motive to fabricate.  The defense, in its written submission, referred to the issue of whether EM had a motive to fabricate the allegations in order to avoid possible hospitalization resulting from her actions in the house.  During the Article 39(a) hearing, defense counsel also argued that EM had a motive of gaining attention.  Specifically, counsel noted that EM had four brothers and sisters and that she competed with them for her mother's attention.  Dr. McMichael had described this as a recurring theme in her treatment, and defense counsel argued, "[w]hat better way to get attention from your mother than to say my cousin raped me and assaulted me."  Defense counsel also argued that the proffered testimony should be viewed in the context of other evidence impeaching EM's credibility, including a defense witness who testified that EM had admitted to lying about events.  Counsel noted that in view of this evidence of falsehood, the defense needed "to present to the members why she's being untruthful."  Defense counsel noted:

17

> [O]ur theory of the case is that she is attention
> starved.  She wants the attention from her mother.
> She loves the attention from Dr. McMichael.  And
> interestingly enough, Dr. McMichael said, [w]ell you
> know what, the self-mutilation, secondarily could be
> to get attention from her mother.  That is our theory
> of the case.  And it is not unreasonable.

The defense contended that exclusion of this evidence would violate the right to confrontation and compulsory process.

The military judge ruled against the defense, prohibiting the introduction of any evidence of EM's mental health issues. The restrictions imposed by the military judge precluded testimony from Dr. McMichael as well as further examination of EM.  The military judge stated that "at no point was there a fragile theory of bias presented."  The military judge further noted that the proffered evidence "had very low probative value" and because there was a risk of confusing the panel, the evidence would be excluded under M.R.E. 403.

## II.  DISCUSSION

The right to confront and cross-examine witnesses and to call witnesses on one's own behalf constitute the essential components of due process in a criminal trial.  U.S. Const. amend. VI; Chambers v. Mississippi, 410 U.S. 284, 294 (1973). The right of confrontation under the Sixth Amendment includes the "constitutionally protected right of cross-examination." Davis v. Alaska, 415 U.S. 308, 316-17 (1974).  Cross-examination

allows the accused to "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." United States v. Collier, 67 M.J. 347, 352 (C.A.A.F. 2009) (omission in original) (quoting Davis, 415 U.S. at 318). Military Rule of Evidence (M.R.E.) 608(c) "allows for evidence to show bias, prejudice, or any motive to misrepresent through the examination of witnesses or extrinsic evidence." United States v. Moss, 63 M.J. 233, 236 (C.A.A.F. 2006). "The partiality of a witness . . . is always relevant as discrediting the witness and affecting the weight of his testimony." Id. (quoting Davis, 415 U.S. at 316) (omission in original) (quotation marks omitted). The weight and credibility of a witness's testimony are issues for the members of the panel to decide. United States v. Bins, 43 M.J. 79, 85 (C.A.A.F. 1995).

The military judge may place reasonable limits on cross-examination to avoid problems such as unfair prejudice, harassment, and repetitive or only marginally relevant interrogation. See Collier, 67 M.J. at 353 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). Under M.R.E. 403, the military judge may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members,

or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

On appeal, the first granted issue addresses the military judge's exclusion of evidence concerning EM's prior mental health history, focusing on the relationship of the proffered evidence to the defense theory that EM had a motive to fabricate. The second granted issue concerns the exclusion of evidence which the defense sought to introduce in rebuttal of the prosecution's claim that Appellant lied to witnesses regarding EM's use of medication in order to protect himself from punishment.

A.   ISSUE I:  EXCLUSION OF EVIDENCE CONCERNING THE
COMPLAINANT'S MOTIVE TO FABRICATE

Under M.R.E. 608(c) a defendant has the right to present evidence which shows bias, prejudice or a motive to lie. In this case EM and Appellant were the only two people present during the circumstances constituting the charged offenses. The other witnesses presented by the prosecution arrived on the scene in the aftermath of those circumstances. In that context, the credibility of EM formed a critical component of the prosecution's case.

The majority contends that Appellant did not establish the relevance of the evidence at trial. I respectfully disagree. Defense counsel at trial set forth two viable grounds for

presenting the court-martial panel with information concerning a motive to lie. First, the proffered evidence showed that EM was a troubled young woman with dysfunctional coping skills whose psychological problems involved a competition for the attention of her mother. Defense counsel sought to introduce evidence that would enable the court-martial panel to consider whether fabricating a rape and assault allegation provided a means of getting attention from her mother.

Second, the defense sought to introduce evidence that would permit the court-martial panel to consider whether EM had a motive to lie based upon fear of hospitalization if her mother found out that she had another episode of self-mutilation. To support this theory the defense proffered evidence that EM's mother had reluctantly considered residential treatment in the past. The majority concludes that the evidence was not relevant because the defense did not show that EM had a contemporaneous fear of hospitalization or that the mother contemplated hospitalization in the future. Those matters go to weight, not relevance. The defense proffered evidence of past contemplation of hospitalization based upon self-mutilation. The evidence was not so remote in either time or detail as to be irrelevant or otherwise excludable under M.R.E. 403. The responsibility for assessing EM's credibility in light of that evidence rested with the members, a function that they could not perform due to the

21

exclusion of the evidence by the military judge. See Bins, 43 M.J. at 85.

The military judge compounded the error by prohibiting the defense from questioning EM about the possibility that her wounds were caused by self-mutilation unless the defense could produce additional evidence that EM was the source of her own injuries. EM was the only prosecution witness to provide direct testimony about the details of the charged offenses. In that context, the military judge erred by prohibiting the defense from asking a person with a history of cutting herself the questions pertinent to whether her injuries on the day in question could have resulted from yet another incident of self-mutilation.

The exclusion of the evidence constituted prejudicial error. The defense, through other evidence, directly challenged EM's credibility by showing that she had made statements pertinent to the proceedings that were inconsistent and perhaps untruthful. The military judge's rulings, however, meant that the defense could not place those matters in proper context. If the defense had been able to explore EM's motive to lie, a reasonable panel might have reached a different conclusion about EM's credibility.

### B.   ISSUE II:   THE EVIDENCE OF PRIOR MEDICATION

The prosecution opened the door to the discussion of medication when it accused Appellant of lying to the other witnesses about EM needing medication.  The prosecution's reference to Appellant's statement was neither inadvertent nor incidental.  The prosecution first referred to Appellant's comment in its opening statement, asserting that on the day in question EM was not on medication.  The prosecution repeatedly elicited testimony about Appellant's statement and EM's claim that she was not on medication from virtually every witness presented during the prosecution's case-in-chief.  EM testified that she believed that Appellant had told people that she was on medication to make her seem unstable.  In closing, trial counsel focused on Appellant's statement and told the panel:

> The accused lied about her being on medication.  He lied . . . because [EM] was not on medication.  You heard that from [EM] herself, and you heard it from her mother.  She was not on any medication that day.  This is a lie concocted by the accused to extract her from that situation so that he would not get caught.

The prosecution presented Appellant's statement as a lie to protect himself.  The military judge recognized that in the absence of additional information it would appear that Appellant had made the story up out of the blue, but nonetheless the military judge refused to allow Appellant to respond to this assertion.

If not excluded by the military judge, there would have been sufficient evidence on the record for the members to consider whether Appellant had a reasonable basis for believing that EM's behavior on the day of the charged incident resulted from medication. The record contained evidence that Appellant was related to EM's family and that he had lived for a time in the family household. Dr. McMichael testified that EM's psychological problems had been ongoing since 2002. He further testified that he had last prescribed medication in 2005, which would have called into question EM's testimony that she had last been on medication in 2003. Dr. McMichael also noted that EM had been non-compliant with regard to the medication, taking it properly at some points and not taking it at other times. The issue of when EM was last on medication goes to weight not relevance. The proffered testimony made clear that EM had been on medication for a period of time spanning years. In light of that evidence, the responsibility for deciding whether Appellant had a reasonable belief that EM was taking medication in the period close to the incident, and that he believed her behavior resulted from failure to adhere to a medication regime, rested with the members, not the military judge. Allowing the prosecution to repeatedly brand Appellant's statement as a lie, while simultaneously precluding him from introducing evidence

24

showing a basis for that statement, constituted prejudicial error.


### III.  CONCLUSION

The military judge committed prejudicial error by precluding Appellant from presenting evidence and engaging in cross-examination pertinent to the credibility of the only person who testified as to the details of the charged offenses. I would set aside the findings and sentence and authorize a rehearing.