# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 39047**

_____

**UNITED STATES**
*Appellee*

v.

**Elijah M. LANGHORNE**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 5 December 2017

_____

*Military Judge:* Shelly W. Schools (arraignment); Vance H. Spath.

*Approved sentence:* Dishonorable discharge, confinement for 12 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 20 November 2015 by GCM convened at Tinker Air Force Base, Oklahoma.

*For Appellant:* Major Annie W. Morgan, USAF; Brian L. Mizer, Esquire.

*For Appellee:* Major Matthew J. Neil, USAF; Major Mary Ellen Payne, USAF; Gerald R. Bruce, Esquire.

Before DREW, MAYBERRY, and DENNIS, *Appellate Military Judges.*

Chief Judge DREW delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge DENNIS joined.

_____

**PUBLISHED OPINION OF THE COURT**

_____

DREW, Chief Judge:

Appellant entered mixed pleas at his court-martial. A general court-martial with officer members convicted Appellant, contrary to his pleas, of two specifications of conspiracy to commit premeditated murder of MC, in vi-

olation of Article 81, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 881; one specification of aggravated arson of an inhabited dwelling, in violation of Article 126, UCMJ, 10 U.S.C. § 926; and one specification of reckless endangerment by wantonly setting fire to a dwelling, likely to cause death or grievous bodily harm to SB and CL, in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1] The military judge accepted Appellant's pleas and found him guilty of one specification of divers wrongful use of anabolic steroids and one specification of wrongful distribution of anabolic steroids, both in violation of Article 112a, UCMJ, 10 U.S.C. § 912a. The court members sentenced Appellant to a dishonorable discharge, confinement for 12 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises ten issues on appeal: (1) whether the military judge abused his discretion in finding that the government's warrantless search of Appellant's Facebook account did not violate the Fourth Amendment;[2] (2) whether the military judge abused his discretion in denying a Defense request to impeach a witness by contradiction; (3) whether the military judge abused his discretion in denying a Defense request to introduce evidence of Appellant's character for helpfulness; (4) whether the offense of reckless endangerment by setting fire to a dwelling, in violation of Article 134, UCMJ, was preempted by Article 126, UCMJ; (5) whether the military judge erred in denying a Defense request for an instruction on a lesser included offense of simple arson; (6) whether the military judge erred in instructing on the elements of aggravated arson of an inhabited dwelling; (7) whether the military judge erred in declining to give a Defense-requested instruction in response to a court member question during deliberations; (8) whether the evidence is factually sufficient to establish that Appellant did not abandon the conspiracy to commit premeditated murder alleged in Specification 2 of Charge II; (9) whether the military judge abused his discretion in determining that the authorization to seize Appellant's cell phone was sufficiently particular;[3] and

---

[1] The court members acquitted Appellant of attempted premeditated murder of MC.

[2] U.S. CONST. amend. IV.

[3] The Prosecution did not offer any evidence obtained from Appellant's cell phone. A review of cell phone text messages that were admitted in Prosecution Exhibit 27 readily reveals that they were taken from a third party electronic device, as each message is annotated as having been *received from* or *sent to* Appellant's number. Moreover, the Defense specifically indicated that it had no objection to the exhibit. This issue does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

(10) whether the military judge abused his discretion in holding that the search of Appellant's cell phone did not violate the Fourth Amendment.[4]

Although not raised by Appellant, we find that the court-martial order incorrectly reflects Appellant's plea to Charge III and direct that the convening authority substitute a corrected court-martial order.[5] In addition, we note that the time required to complete the appellate review of Appellant's case has exceeded the presumptively reasonable period of 18 months since the case was docketed with this court, as established in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). We nevertheless find no errors materially prejudicial to Appellant's substantial rights and thus affirm the findings and sentence.

## I. BACKGROUND

Sometime in 2013, Appellant entered into an agreement with a fellow security forces member in his squadron, Staff Sergeant (SSgt) Steven Bailey, to murder MC, a female civilian and the mother of SSgt Bailey's child, in exchange for money. SSgt Bailey met MC in 2011 and she gave birth to SSgt Bailey's daughter, SB, in 2012. Previously engaged to be married, SSgt Bailey and MC broke up shortly after SB's birth. An intense and protracted custody battle for SB ensued and extended over the following three years. MC, who had temporary custody of SB, was ultimately granted permanent custody of SB. SSgt Bailey expressed anger about the custody situation to members of his squadron, including Appellant. SSgt Bailey alleged that MC was physically abusing his daughter.

SSgt Bailey agreed to give Appellant $20,000 to murder MC. He paid Appellant $2,600 in cash up front and another $600 in gift cards and promised to pay the remainder after Appellant killed MC. Appellant and SSgt Bailey discussed several different ways that Appellant might carry out the murder, including arson of MC's house, killing her during a home invasion, shooting

---

[4] *Id.*

[5] The Report of Result of Trial attached to the Staff Judge Advocate's Recommendation (SJAR) to the convening authority contains the same error. However, the error only extended to the Charge and not it's underlying specifications, which correctly reflect Appellant's guilty pleas. Neither the Addendum to the SJAR nor Appellant's submissions personally or through counsel noted the administrative error, although his trial defense counsel correctly noted that Appellant pled guilty to both specifications. Under these circumstances, we do not believe that the administrative error prejudiced Appellant's post-trial processing, to include his opportunity for clemency from the convening authority.

her with a rifle from a distance, launching a grenade through her window, and killing her in her car in a drive-by shooting. SSgt Bailey's one stipulation was that Appellant couldn't hurt SB, but SSgt Bailey didn't care about MC's son or mother.

On 11 January 2014, Appellant purchased a propane torch and some other materials from a local hardware store. On 17 January 2014, at approximately 0300, Appellant carried the torch through the wooded area behind MC's house in a rural town near Tinker Air Force Base, Oklahoma. Inside her home, MC and her two children, including SB, were asleep. Appellant wedged the torch against the back of the house, up against the one section of the structure that he knew—based on his previous experience as a building contractor—was clad with flammable materials. He set the torch alight and retreated back into the woods. He watched from a distance for 15 to 20 minutes and then left.

At some point after Appellant set the fire, MC awoke to SB crying for a bottle. MC smelled smoke. She looked around the inside of the house but couldn't find the source of the smell. She quickly bundled up her children and fled to a nearby gas station where she called the police. A police officer arrived at the home around 0320 and found the inside of the house filling with smoke and the outside back of the house on fire. Shortly thereafter the fire department arrived. Either the police officer or the fire department extinguished the fire, leaving the back of the home damaged, but otherwise livable.

SSgt Bailey was upset with Appellant that he had set the fire while SB was inside. However, they continued their plotting to kill MC. They exchanged coded text messages and met in person to discuss ways to kill MC while SB was not present and SSgt Bailey had an alibi. In July 2014, Appellant followed MC and her mother in a white pickup truck after they dropped off SB with SSgt Bailey as part of a scheduled custody exchange. Suspicious of the truck that was aggressively following them despite their attempts to lose it, SB and her mother called the local police in a panicked state. A police officer gave them instructions to pull onto a certain road where he would intercept the truck. The officer stopped Appellant and asked him what he was doing in the area. When Appellant produced his military ID, the officer, who was aware of SSgt Bailey's and MC's strained custody situation and SSgt Bailey's military status, asked Appellant if he knew SSgt Bailey. Appellant lied and said he didn't. The officer didn't believe him but hadn't personally observed anything that would give him a basis to arrest Appellant, so he warned Appellant to stay away from MC.

Spooked by being pulled over by the local police, Appellant told SSgt Bailey that he was no longer interested in killing MC in her rural town.

However, Appellant and SSgt Bailey continued to plot ways to kill MC. They discussed killing MC in a parking garage in Oklahoma City near the courthouse, as she arrived for a custody hearing. Appellant rented a car to surveil the area without having his own vehicle noticed. They also stole license plates from another car to reduce the chances of a vehicle tied to them being observed during their activities in support of the murder plot.

By March of 2015, SSgt Bailey was frustrated that Appellant had not yet killed MC, and so he approached another military member friend, whose brother had been imprisoned. SSgt Bailey thought that the brother would know someone who could carry out the murder if Appellant didn't take care of it soon. Unbeknownst to SSgt Bailey, the friend reported SSgt Bailey's request to the Air Force Office of Special Investigations (AFOSI), who arranged for the friend to wear a recording device during several conversations with SSgt Bailey. In the meantime, Appellant, who was scheduled to deploy soon, agreed to provide SSgt Bailey with the .22 caliber Sig Sauer Mosquito pistol that he had bought at the Base Exchange, along with a threaded adapter and a muzzle suppressor he had fashioned out of an automobile oil filter. After making telephonic arrangements with an undercover agent he believed to be a hit man arranged by his friend, SSgt Bailey dropped a bag at an agreed-upon location. The bag contained Appellant's pistol and suppressor, along with bullets, a laser sight, a bullet resistant vest, and a dossier of information about MC. After the undercover agent retrieved the bag, SSgt Bailey was apprehended and he confessed to much of the murder plot and implicated Appellant.

The following day, 30 March 2015, AFOSI brought Appellant in for questioning. After initially denying any involvement with the conspiracy and arson, he eventually admitted his role, although he claimed that at no time did he actually intend to kill MC or anyone else. He asserted that he had intentionally done a poor job in an attempt to get SSgt Bailey to change his mind about killing MC. Appellant consented to AFOSI searching his cellphone and its contents. He gave the agents the password to his phone and they made a forensic extraction of the contents for later analysis. Appellant also consented to a search of his truck, where AFOSI found a bag filled with various ski masks, gloves, and a hunting knife. Appellant said that SSgt Bailey gave it to him and they called it the "murder bag." Appellant also gave AFOSI the loaded .45 caliber Glock pistol that he kept in his truck.

## II. DISCUSSION

### A. Evidence from Appellant's Facebook Account

Over Appellant's objection, the Prosecution introduced messages from his Facebook account. AFOSI investigators accessed the account by using the us-

er name and password that Appellant provided to a third person over a monitored telephone line from Appellant's pretrial confinement facility. Appellant asserts that the access of his Facebook account constituted a warrantless illegal search.

Before his trial, Appellant was confined in a local civilian facility where he had access to a facility phone set up for confinees' use. In accordance with the facility's standard procedures, an automated recording notifies the confinee and the recipient of the call that the call is subject to monitoring and recording.[6] The notice can be optionally suppressed by pressing "1" after it begins. Appellant placed a number of calls from the confinement facility to his supervisor, Technical Sergeant (TSgt) PF. During one of the calls on 7 April 2015, Appellant (APP) had the following recorded discussion with TSgt PF about his Facebook account:

> System: *Hello, this is a pre-paid collect call from*
>
> APP: Elijah Langhorne
>
> System: *an inmate of the Potawatomie County Jail. Three-way or call waiting is not allowed and may automatically disconnect this call. This call is also subject to being recorded or monitored, except for privileged communications between attorney and client.*
>
> . . . .
>
> APP: Hey, do you think I should change the password on my Facebook account since my phone was logged into it and OSI's got it?
>
> TSgt PF: Yep, I definitely would.
>
> APP: Okay, uh, is that something you'd be willing to do for me?
>
> TSgt PF: Uh, yeah, . . . go ahead.
>
> APP: Okay, the user name is just my email [. . .]. The password is [. . .].
>
> TSgt PF: Okay.
>
> APP: And if you could just add like, uh, if you could change it to [. . .], that's what I'd prefer it to be.

---

[6] Calls to a confinee's attorney are not recorded or monitored if prior arrangements have been made for a privileged attorney call.

TSgt PF:  Okay, yeah. I'll do it.

In a subsequent call the next day, Appellant asked TSgt PF to retrieve and throw away a license plate from Appellant's truck that he had stashed under his back seat. TSgt PF agreed. It was the stolen plate that Appellant had been using during his murder plot reconnaissance missions. On 6 May 2015, AFOSI learned about Appellant's calls to TSgt PF after TSgt PF's supervisor reported that TSgt PF had spoken to him about Appellant's request to dispose of the license plate. Over the next several days, AFOSI requested and received copies of the recorded conversations from the confinement facility. After reviewing them, AFOSI sought and received a search authorization from a military magistrate to search Appellant's truck, where they found the license plate still under the back seat. Without seeking a military search authorization, civilian search warrant, or consent from Appellant, AFOSI accessed Appellant's online Facebook account from 11–13 May 2015. They used the account name and password[7] that Appellant disclosed to TSgt PF over the recorded phone call. They copied several messages from the Facebook account into a Word document.

We review a military judge's ruling on the admissibility of evidence for an abuse of discretion. *United States v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017) (denial of a motion to suppress) (citing *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F. 2016)); *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (decision to admit or exclude evidence) (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)). However, we review any conclusions of law de novo. *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009). A military judge abuses his discretion when (1) the findings of fact upon which he bases his ruling are not supported by the evidence of record; (2) he uses incorrect legal principles; or (3) his application of the correct legal principles to the facts is clearly unreasonable. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citations and quotation marks omitted). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004).

---

[7] The record does not reflect whether the password AFOSI successfully used was Appellant's old password or the new one to which he had asked TSgt PF to change it.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Under the Fourth Amendment, a "search" occurs when "the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). Under the third-party doctrine, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties . . . even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979) (citing *United States v. Miller*, 425 U.S. 435, 442–44 (1976)). *See also United States v. Larson*, 66 M.J. 212, 215 (C.A.A.F. 2008); *United States v. Caira*, 833 F.3d 803, 806 (7th Cir. 2016). When Appellant voluntarily revealed his Facebook username and password to TSgt PF, he no longer had a reasonable expectation of privacy in his Facebook account. The fact that Appellant was aware that his telephone conversation was being recorded and subject to monitoring further cements the conclusion that when AFOSI used the recorded information to access and copy his Facebook messages, the investigator's actions did not constitute a "search" under the Fourth Amendment, since they did not violate a reasonable expectation of privacy. Accordingly, the military judge did not abuse his discretion when he overruled the Defense objection and admitted Appellant's Facebook messages.

## B. Impeachment by Contradiction

At trial, defense counsel sought to introduce extrinsic evidence that SSgt Bailey lied on three previous occasions. Specifically that he had falsely claimed that MC had cancer, that he had falsely claimed to being disabled due to a metal plate in his head, and that he had intentionally failed his Personnel Reliability Program (PRP) qualifications. The military judge ruled that defense counsel was improperly attempting to introduce specific instances of conduct in order to attack SSgt Bailey's character for truthfulness. As he did at trial, Appellant contends that his counsel was actually attempting to impeach SSgt Bailey by contradiction. We review a military judge's decision to exclude or admit impeachment evidence for abuse of discretion. *United States v. Bins*, 43 M.J. 79, 83 (C.A.A.F. 1995).

During the extensive cross-examination of SSgt Bailey, the senior defense counsel impeached him with prior inconsistent statements, a bad character for truthfulness, previous instances in which he had minimized his criminal culpability in his discussions with AFOSI, and a motive to misrepresent to preserve his pretrial agreement sentence limitation. Towards the end of the cross-examination, the defense counsel asked SSgt Bailey if he had ever told his unit that MC had cancer. He admitted he had. The defense counsel then

asked him about making the false disability claim and intentionally failing his PRP qualifications. SSgt Bailey denied both instances. None of the purportedly untruthful statements were material to any of the allegations facing Appellant at his trial and none of them were raised during SSgt Bailey's direct testimony.

The military judge denied the Defense requests to introduce extrinsic evidence based on Mil. R. Evid. 608(b):

> *Specific Instances of Conduct.* Except for a criminal conviction under Mil. R. Evid. 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. The military judge may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness . . . .

Appellant contends that the military judge erred because he should have permitted the extrinsic evidence, not as character evidence, but as a form of impeachment by contradiction. Appellant misunderstands how and when to use impeachment by contradiction.

The Military Rules of Evidence explicitly permit impeachment by contradiction only of an accused—in Mil. R. Evid. 304(e)(1), through the use of a suppressed involuntary statement, and in Mil. R. Evid. 311(c)(1), through the use of suppressed evidence obtained as a result of an unlawful search or seizure. However, the Military Rules of Evidence, like their federal counterpart, are not exhaustive. Other techniques of impeachment, including impeachment by contradiction of witnesses generally, while not explicitly codified, are nevertheless permissible. *MCM*, App. 22, at A22-55.

Impeachment by contradiction, when proper, allows a party to introduce extrinsic evidence to contradict the testimony of a witness. By definition, it does not apply to bolster a concession made in cross-examination, as the extrinsic evidence must *contradict* the testimony. In the military courts, "[t]he normal rule of impeachment by contradiction is that a witness may not be contradicted by extrinsic evidence on a collateral matter." *United States v. Banker*, 15 M.J. 207, 211 (C.M.A. 1983). However, an exception to that rule allows for the introduction of extrinsic evidence to impeach by contradiction a collateral matter raised during *direct* examination. *Id.*; *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir.), *cert. denied*, 513 U.S. 826 (1994). "A matter is collateral if the fact could not be shown in evidence for any purpose independent of the contradiction." *United States v. Harris*, 542 F.2d 1283, 1306–07 (7th Cir. 1976). Evidence of a witness's bias, prejudice, or motive to misrepresent is never collateral and may be proven by extrinsic evidence. Mil. R. Evid. 608(c).

Defense counsel attempted to open the door to extrinsic evidence by raising matters for the first time on cross-examination. The matters offered by Appellant did not tend to establish SSgt Bailey's bias, prejudice, or motive to misrepresent. They were not otherwise relevant or admissible for any purpose other than to contradict SSgt Bailey's denial of specific instances of untruthfulness and were therefore collateral. Even if SSgt Bailey's lying to his unit about MC having cancer had not been collateral, his admission of the fact foreclosed defense counsel's ability to introduce extrinsic evidence to contradict it. As to the other specific instances that the Defense asserted tended to show that SSgt Bailey was untruthful, defense counsel was stuck with SSgt Bailey's denial and neither Mil. R. Evid. 608(b) nor impeachment by contradiction allowed the Defense to introduce extrinsic evidence. Accordingly, the military judge did not abuse his discretion.

## C. "Character for Helpfulness" Evidence

The Defense sought to introduce a number of affidavits attesting to Appellant's "character for helpfulness." As stated on the record, the Defense theory was that Appellant was being "helpful" by going along with SSgt Bailey's requests to assist him in killing MC. That theory appears to be strikingly similar to the Prosecution's theory that Appellant was indeed trying to help SSgt Bailey kill MC, specifically by conspiring with him to commit premeditated murder. However, in the Defense version, Appellant was trying to help his friend by bringing him to his senses, in an attempt to convince him *not* to pursue his murderous plans.

Military judges have broad latitude to employ rules of evidence to exclude evidence, but an accused has a constitutional right to "a meaningful opportunity to present a complete defense." *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324, (2006)). Such a defense could potentially involve the introduction of character evidence under Mil. R. Evid. 404(a)(2)(A), but, like all other evidence, it must first be relevant under Mil. R. Evid. 401, that is, it must have a "tendency to make a fact more or less probable than it would be without the evidence, and . . . the fact [must be] of consequence in determining the action."

While the Defense may very well have been correct that Appellant has a "helpful" character, the military judge did not abuse his discretion in determining that it was not a pertinent character trait under Mil. R. Evid. 401 and 404(a)(2)(A).

## D. Preemption

Appellant contends that the Specification of Charge V—alleging reckless endangerment of MC's two minor children by setting fire to their dwelling under clauses 1 and 2 of Article 134, UCMJ—was preempted by the Specifi-

cation of Charge IV—alleging aggravated arson of the same dwelling under Article 126. The preemption doctrine prohibits application of Article 134 to conduct covered by Articles 80 through 132. *MCM*, pt. IV, ¶ 60.c.(5)(a). We review questions of preemption de novo. *United States v. Benitez*, 65 M.J. 827, 828 (A.F. Ct. Crim. App. 2007).

The Court of Appeals for the Armed Forces (CAAF) has long placed an additional requirement on the application of the preemption doctrine that has greatly restricted its applicability:

> [S]imply because the offense charged under Article 134, UCMJ, embraces all but one element of an offense under another article does not trigger operation of the preemption doctrine. In addition, it must be shown that Congress intended the other punitive article to cover a class of offenses in a complete way.

*United States v. Anderson*, 68 M.J. 378, 386–87 (C.A.A.F. 2010) (citing *United States v. Kick*, 7 M.J. 82, 85 (C.M.A. 1979)) (alteration in original). The preemption doctrine "applies only when (1) Congress intended to limit prosecution for . . . a particular area of misconduct to offenses defined in specific articles of the Code, and (2) the offense charged is composed of a residuum of elements of a specific offense." *United States v. Curry*, 35 M.J. 359, 360–61 (C.M.A. 1992) (quotation marks and citations omitted) (ellipsis in original).

The military judge correctly instructed the members that the elements of the Specification of Charge IV, aggravated arson, in violation of Article 126 are:

> (1) That on or about 17 January 2014, at or near . . . , Oklahoma, the accused set on fire an inhabited dwelling, that is: the residence of [MC], . . . , Oklahoma, which was the property of [MC];
>
> (2) That the property of [MC], . . . , Oklahoma, was of a value of about $70,000 or of some lesser value in which case the finding should be in the lesser amount; and
>
> (3) That the act was willful and malicious.

The military judge further instructed the members that the elements of the Specification of Charge V, reckless endangerment, in violation of Article 134 are:

> (1) That on or about 17 January 2014, at or near . . . , Oklahoma, the accused did engage in conduct, to wit: set on fire the dwelling located at . . . , Oklahoma;
>
> (2) That the conduct was wrongful and wanton;

(3) That the conduct was likely to produce death or grievous bodily harm to another person; specifically, [SB] and [CL]; and

(4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces and was of a nature to bring discredit upon the armed forces.

While Appellant asserts that Congress "occupied the field" of reckless endangerment by setting fire to a dwelling by setting forth aggravated arson offenses in Article 126, he offers no evidence from the legislative history or otherwise to establish his position. Furthermore, a simple review of the elements of reckless endangerment under Article 134 clearly establishes that the Article 134 offense is not composed of a residuum of elements of the Article 126 offense. Furthermore, the two offenses address different societal concerns. Reckless endangerment, an offense against persons, contains the additional element that the conduct alleged was likely to produce death or grievous bodily harm to another person, whereas aggravated arson, an offense against property, does not. In conclusion, Article 134 reckless endangerment is not preempted by Article 126.

## E. Instructions

### 1. Standard of Review

We review issues involving a failure to give a required instruction de novo. *United States v. Bean*, 62 M.J. 264, 266 (C.A.A.F. 2005). An instruction on the elements of each offense charged is a required instruction. Rule for Courts-Martial (R.C.M.) 920(e)(1). An instruction on each lesser included offense in issue is a required instruction. R.C.M. 920(e)(2).

> A matter is "in issue" when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose. An instruction of a lesser included offense is proper when an element from the charged offense which distinguishes that offense from the lesser offense is in dispute.

R.C.M. 920, Discussion. "The military judge has a duty to instruct sua sponte on all lesser-included offenses reasonably raised by the evidence." *Id.* (quoting *United States v. Griffin*, 50 M.J. 480, 481 (C.A.A.F. 1999)).

> An accused is entitled to have a court-martial consider all reasonable alternatives to guilt. Toward this end, as long as an accused can show "some evidence" that "reasonably raises" the applicability of a lesser included offense, the military judge must instruct the panel on that lesser included offense. Evi-

> dence "reasonably raises" a lesser included offense if it could cause members to "attach credit" or rely upon it if they so choose. Finally, any doubt whether the evidence is sufficient to raise the need to instruct on a lesser-included offense must be resolved in favor of the accused.

*Bean*, 62 M.J. at 266 (quotation marks and citations omitted). "A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense." *Sansone v. United States*, 380 U.S. 343, 349–50 (1965) (citations omitted).

### 2. Waiver versus Forfeiture in the Context of Instructions

As the CAAF has stated:

> Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right. The distinction between the terms is important. If an appellant has forfeited a right by failing to raise it at trial, we review for plain error. When, on the other hand, an appellant intentionally waives a known right at trial, it is extinguished and may not be raised on appeal.

*United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (quotation marks and citations omitted); *see also United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (appellate courts "do not review waived issues because a valid waiver leaves no error to correct on appeal."). However, we recognize that, unlike the CAAF, this court is permitted, under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to review issues affirmatively waived by an appellant at trial. *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) ("CCAs are required to assess the entire record to determine whether to leave an accused's waiver intact, or to correct the error.").

Generally, failure to object to an instruction constitutes forfeiture of the issue, notwithstanding the use of the term "waiver" in R.C.M. 920(f). "Failure to object to an instruction or to omission of an instruction before the members close to deliberate constitutes waiver of the objection in the absence of plain error." R.C.M. 920(f); *see Ahern*, 76 M.J. at 197 (acknowledging R.C.M. 920(f) uses the word "waiver" but actually means "forfeiture"). However, an affirmative relinquishment of any objection to an instruction constitutes actual waiver. *Cf. United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009) ("While circumstances may arise where a 'no objection' statement by a defense attorney is not enough to demonstrate an intentional relinquishment of

a known right, the record in this case does in fact reflect such a relinquishment.").

### 3. Instructions Challenged on Appeal

#### a. Lesser Included Offense of Simple Arson

At trial, Appellant requested that the military judge instruct the members that simple arson was an available lesser included offense of the aggravated arson offense alleged in the Specification of Charge IV. After initially indicating that he would so instruct, the military judge reconsidered and denied the Defense request.

The elements of aggravated arson of an inhabited dwelling are:

>(1) That the accused burned or set on fire *an inhabited dwelling;*

>(2) That this dwelling belonged to a certain person and was of a certain value; and

>(3) That the act was willful and malicious.

*MCM*, pt. IV, ¶ 52.b.(1)(a) (emphasis added).

The elements of simple arson are:

>(1) That the accused burned or set fire to *certain property* of another;

>(2) That the property was of a certain value; and

>(3) That the act was willful and malicious.

*MCM*, pt. IV, ¶ 52.b.(2) (emphasis added).

Thus, the difference between aggravated arson as alleged and simple arson is that the former requires the property burned or set on fire to be an inhabited dwelling, whereas the latter does not. At trial the Defense did not dispute the fact that the structure upon which Appellant placed the lit propane torch was MC's inhabited dwelling. Indeed, in the Defense's closing argument they concede that Appellant knew the property was MC's house. What they contested was whether Appellant intended the house to actually catch on fire. The only disputed factual element was whether Appellant's act was willful and malicious, the common third element of both offenses. Accordingly, the military judge correctly ruled that the lesser included offense of simple arson was not reasonably raised by the evidence.

#### b. Elements of Aggravated Arson

Appellant contends for the first time on appeal that the *MCM* and longstanding military precedent incorrectly state the elements of Article 126 ag-

14

gravated arson of an inhabited dwelling. Specifically, Appellant asserts that rather than the three stated elements, the correct elements are actually the five elements of the related offense of aggravated arson of a structure.

Prior to instructing the members on the elements of the offenses, the military judge held an Article 39(a) session with the parties without the court members present in order to discuss the draft instructions. In particular, the military judge based his aggravated arson instructions on the pattern instructions in the *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 706–07 (10 Sep. 2014), and the specifically tailored language requested by the Defense. After discussing how the military judge had incorporated the Defense-requested language, the senior defense counsel responded "[w]e are fine with the way you have it, sir."

Under the facts in this case, senior defense counsel's statement, "[w]e are fine with the way you have it, sir," constituted an affirmative waiver of any issues Appellant may now have with the military judge's instruction on the elements of aggravated arson. Considering our role pursuant to Article 66(c), along with the statutory language of Article 126 and the *MCM,* we leave Appellant's waiver of this instructional issue intact. *Chin*, 75 M.J. at 223.

### c. Elements of Conspiracy

In the middle of findings deliberations, the court members requested a supplemental instruction from the military judge regarding the overt act alleged as part of Specification 1 of Charge II. After an initial discussion with the members, the military judge held a session outside their presence to discuss the supplemental instruction. After considering the views of both parties, the military judge proposed a particular instruction, to which the senior defense counsel responded, "that's perfect." After bringing the members back in and instructing them along the lines discussed, the military judge asked both sides if they had any objections to the instruction as given or requests for additional instructions. Senior defense counsel responded, "No, your honor." Appellant now complains that the military judge's instruction was in error.

We have no reason to fault the military judge's supplemental instruction or relieve Appellant of his clearly articulated affirmative waiver of "that's perfect." *Id*.

## F. Factual Sufficiency of Conspiracy Conviction

Appellant challenges the factual sufficiency of his conspiracy conviction in Specification 2 of Charge II, asserting that the evidence is insufficient to prove that he had not withdrawn from the conspiracy. We review factual sufficiency de novo. *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007). The test for legal sufficiency of the evidence is "whether, considering the evi-

dence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term "reasonable doubt" does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The term "reasonable doubt" "does not mean that the evidence must be free of conflict." *United States v. Galchick*, 52 M.J. 815, 818 (A.F. Ct. Crim. App. 2000).

Appellant points to the following text message he sent to SSgt Bailey: "Unless something drastic changes I'm not going to be able to help you man. I can give you the hammer I've got next week if you want it, but that's all I can do." "Hammer" is the code word Appellant and SSgt Bailey used to refer to Appellant's Mosquito .22 caliber pistol that he purchased at the Base Exchange.

The elements of conspiracy are:

> (1) That the accused entered into an agreement with one or more persons to commit an offense under the UCMJ; and
>
> (2) That, while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy.

*MCM*, pt. IV, ¶ 5.b.

> *Withdrawal.* A party to the conspiracy who abandons or withdraws from the agreement to commit the offense before the commission of an overt act by any conspirator is not guilty of conspiracy. An effective withdrawal or abandonment must consist of affirmative conduct which is wholly inconsistent with adherence to the unlawful agreement and which shows that the

> party has severed all connection with the conspiracy. A con-
> spirator who effectively abandons or withdraws from the con-
> spiracy after the performance of an overt act by one of the con-
> spirators remains guilty of conspiracy . . . .

*MCM*, pt. IV, ¶ 5.c.(6).

Appellant's text message was not an effective withdrawal. First of all, it was conditional ("*unless* something drastic changes"). Secondly, his message indicated his willingness to provide a murder weapon ("I can give you the hammer"). In fact, he did provide the weapon to SSgt Bailey after he sent the text message and SSgt Bailey subsequently left it for an undercover agent he believed was another contract killer. If Appellant ever effectively withdrew from the conspiracy, he certainly did not do so before he committed the overt act of exchanging his firearm with SSgt Bailey.

After taking a fresh, impartial look at the evidence, making our own independent determination as to whether the evidence constitutes proof of both of the required elements of conspiracy, and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## G. Delay in Completing Appellate Review

Appellant has not asserted a right to timely review and appeal. However, we note that Appellant's case was docketed with this court on 26 April 2016 and appellate review had not yet been completed as of 26 October 2017. We review de novo whether an appellant has been denied the due process right to a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). In *Moreno*, the CAAF established a presumption of unreasonable post-trial delay that requires a due process review when:

> (1) the convening authority does not take action within 120 days of trial;
>
> (2) the record of trial is not docketed by the service Court of Criminal Appeals within 30 days of the convening authority's action; or
>
> (3) appellate review is not completed within 18 months of docketing.

*Id.* at 142.

If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially-unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135.

*Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id.* at 138–39.

"We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136. Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.*; *see also Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process."). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

This is a complicated case and Appellant's offenses are very serious. The amount of time required by Appellant's defense counsel to effectively and professionally review the trial proceedings and assert errors is appropriately much more than would be required in a more typical, simpler, case. Likewise, the Government reasonably requires more time than is typical to fully analyze and effectively and professionally respond to Appellant's brief. Appellant sought and received six enlargements of time to file his brief and assignments of error, accounting for a total of 362 days. The Government sought a single 30 day enlargement of time to file its answer, accounting for a total of 60 days. The court has taken less than five months to review the record of trial, consider the briefs of counsel, and render its decision.

Appellant, who remains in confinement, has not pointed to any prejudice for the presumptively unreasonable delay and we find none. After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude that the time taken to complete the review of Appellant's case is not unreasonable and we find no due process violation.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.[8]

FOR THE COURT

KATHLEEN M. POTTER
Acting Clerk of the Court

---

[8] We direct the convening authority to issue a corrected court-martial order to correctly reflect Appellant's plea to Charge III.